## JOHN H. HIGGINS *vs.* JAMES L. BROWN.

### Hancock. Rescript June 26, 1886.

*Duress.*

Mere threats of criminal prosecution, when no warrant had been issued nor proceedings commenced, do not constitute duress.*

ON motion of the plaintiff to set aside the verdict.

Replevin of two horses. The plaintiff claimed title to the horses by virtue of a mortgage bill of sale from the defendant. The defense was that the mortgage was procured from

*See *Charles L. Hilborn* v. *J. A. Bucknam et al. Infra*, p.

the defendant through duress, and the verdict was for the defendant.

At the trial the defendant, being called by his counsel as a witness, testified:

Ques. You may state the circumstances, so far as you remember, of your dealings with John H. Higgins in the year 1884.

Ans. In that year a certain fellow told me, I was informed that John Higgins and Sidney Brown stole those two heifers from my pasture, one was mine and the other William————, and I called Brad Higgins over to my house, as he didn't live but a few steps, and told him the story that I heard; that I heard that those two fellows stole my heifers; and we talked there a few minutes and I told him that I afterwards went with him and saw John Higgins. I told them over there what I had heard and they wanted to know who told me, and I told them I should not tell them then, at that time, and passed back home; and in a few minutes John Higgins came over to my house and wanted to know of me if Chester Brown told me that he stole my heifers. Said I, "No." Said I, "Chester Brown didn't tell me that you stole them." Said I, "He told me that you and Sidney Brown stole them.". Well, he said he was going to put Chester through for telling such a story as that about him. Said I, " I can't help what you do about that." Said I, "If there is any proof I can get about the heifers," said I, "I shall try to prove about my heifers." Well, he came to Ellsworth that day he said, and I saw nothing more of them until the time that the meeting was here, the city meeting, fall meeting, in September. I met John Higgins here on the street; he said he had seen Chester Brown, and Chester Brown said he never told me no such thing, and I was a damned liar, "and now," said he, "If you don't drop this," said he, "I will make hot work for you," and I took it he was going to burn me up, burn my buildings. There was nothing more said then for a day or two, and I went over to Bradford Higgins after my tackle that I had lent a man, rope pullies that I had lent a man to kill a beef critter there, and spoke to John Higgins about the heifers, then told him if

he would pay for my heifers I would drop it, wouldn't go any further. He said he wouldn't do no such thing, and he didn't steal the heifers, and wouldn't pay me for the heifers. He said he had something against me he was going to State's prison me for, said he had been to see as good a lawyer as there was in town. I didn't make much talk to him, but went home with my tackle. . . . When I went over this second time, John and Bradford Higgins were both present. At that time there was something said about the crime I had committed. They said I had committed a crime. John said so, and he said if I didn't come out and fix it up with them that they were going to put me in State's prison, or could do it.

Q. What did they want you to do?

A. They wanted me to give them $100.

Q. State what was said.

A. I will state as near as I can remember. John Higgins said if I didn't come out to Ellsworth and fix up with them that he would State's prison me for a crime I had done when I was a boy, against a mare. His father and mother see me do it; and I told them I didn't know whether I would or not. I would think it over; and I went back home, and along in the evening I went there—dare'sn't stay there alone, and went over and got Herman Hooper to get him to come over and stay with me. Herman said he would come over. I met him on the road and went to his house, and stayed there and talked a few minutes, and went down back of the house the back way and stopped a few minutes, and then went down to John Carter's. I stayed and talked with John Carter a few minutes, as John lives off from the county road, passed up on the county road and passed along a little ways to the main back road that goes through from my place to Bangor, and up to the private way that goes across to my house, and when I got there I see—when we got there, Herman and I, we see two men—

Q. Where did you go next?

A. Standing in the door, and went out to see who they were, and then went into the house. John Higgins was one of them and Hollis Hooper was the other. Then we went into the house.

Herman stayed there. This was between 10 and 11 o'clock at night. Herman stayed there a little while with me, and said he must go home to feed his horse, and he was gone a few minutes and came back again. I was in my bed-room when he came, making my bed, I think, and he says: I was informed that—

Q. Did any one come to the door soon after?

A. They did. Bradford Higgins and John came to the door. I went to the door, I asked Herman to go with me, and Herman went to the door with me, and there was John Higgins and Bradford stood at the door. John Higgins said that he thought Herman was going to carry me away somewheres, and I was going to dispose of my property and run away, and "we are going to watch you to-night, and if you go away anywheres we shall telegraph after you to stop you." "Now," said he: "If you don't go to Ellsworth and fix up with us to-morrow, why, we will State's prison you," and they started away; and I went back into the house. There was nothing more stated at all— well, it was that they would State's prison me on this mare scrape, he said; and there was nothing more said till the next morning. I came to Ellsworth and they overtook me out here on the road. I don't remember justly what they said. They overtook me up to Mr. Grant's. That is about half or three-quarters of a mile from here. I had slept none for a number of nights, none to amount to anything. We came in here and they watched me around, and at last I saw John down there on the corner. He told me, said he: "Come, go up into this office and fix up with me as I want you to;" and I went up into the office. I don't remember what was done up there, to amount to anything. I know there was some papers passed to me and I signed them, and I had no more talk with them after, from that time to this, anything more than just speak.

*Wiswell and King*, for plaintiff.

*John B. Redman*, for defendant.

PER CURIAM:

The evidence in this case is not sufficient to sustain the verdict.

There is not any evidence of threats, of impending danger, or personal violence.

The threats as stated by the defendant himself amounted to nothing more than that the plaintiff was going to commence criminal proceedings.

These threats were not connected with any prosecution then pending. No warrant had been issued, or proceedings commenced. Assuming the testimony of the defendant to be true, he does not exhibit such a state of affairs as would constitute duress according to the well settled rules of law. *Harmon* v. *Harmon*, 61 Maine, 230.

*Motion sustained. New trial granted.*