BULLARD, APPELLANT, *v.* SMITH, RESPONDENT.

(No. 1,588.)

(Submitted May 27, 1903. Decided June 10, 1903.)

*Promissory Notes—Negotiability — Provisions for Attorney's Fees—Amendment of Statute Affecting Negotiability—Constitutionality — Retroactive Operation — Consideration — Duress — Burden of Proof — Evidence — Witnesses — Impeachment—Instructions.*

1. Laws of 1899, page 115, amending Section 3996, Civil Code, so as to permit a negotiable instrument to contain a provision for reasonable attorney fee, was prospective in its operation only, and did not make negotiable a note, given before its passage, which was non-negotiable by reason of its containing a provision for attorney's fees.
2. The circumstances under which a contract is made, or the intent of the parties existing at the time, are only material when the contract is ambiguous in some of its terms.
3. A party cannot impeach an opposing witness by introducing evidence contradictory of testimony elicited from him for the first time on cross-examination.

4. Where, on asking a question, counsel, in response to a query by the court, stated ·the purpose of the testimony sought to be brought out, he was precluded from thereafter claiming a different purpose.

5. Alleged error in failing to require a witness to answer a question, which he refused to answer on the ground that it involved .a privileged communication from a client, was not cause for reversal, where the evidence sought to be elicited was inadmissible, though no objection was made at the time.

6. Where plaintiff believed that certain property had been stolen from him, and that defendant was connected with the theft, and the latter gave a note to plaintiff for the damages occasioned by the theft, there was a sufficient consideration for the note.

7. Evidence considered, and *held* insufficient to sustain a jury finding that the note sued on was executed under duress.

8. The giving of an instruction having no foundation in the evidence is error.

9. When a suit is brought by an indorsee or assignee of a non-negotiable note, the burden of proof is upon him to show that the note was originally issued upon valuable consideration, and that he is a *bona fide* holder thereof, but the burden does not also rest upon him to show that no other defense exists to the note.

10. In an action on a note, the burden of proving duress is on defendant.

*Appeal from District Court, Custer County; C. H. Loud, Judge.*

ACTION by W. H. Bullard against H. A. Smith. From a judgment for defendant, and from an order denying a new trial, plaintiff appeals. Reversed.

*Mr. Sydney Sanner,* and *Mr. T. J. Porter,* for Appellant.

The note in suit is negotiable, because the Act of 1899, amending Section 3996, Civil Code, is remedial, to be liberally construed, and is properly applicable to the note in suit. (Black on Interpretation of Laws, pp. 261-263, 307-312; *Ins. Co.* v. *Talbot,* 3 Am. St. Rep. 655; *Bank* v. *Fuqua,* 11 Mont. 282; *Wilson S. M. Co.* v. *Moreno,* 7 Fed. 806; *Salisbury* v. *Stewart,* 62 Am. St. Rep. 934; *Williams* v. *Flowers,* 24 Am. St. Rep. 772; *Montgomery* v. *Crossthwaite,* 24 Am. St. Rep. 832; *Shenandoah Bank* v. *Marsh,* 48 Am. St. Rep. 381; *Sperry* v. *Horr,* 32 Iowa, 104; *Carriere* v. *Minturn,* 5 Cal. 435; *Monroe* v. *Fohl,* 72 Cal. 571; *White* v. *Allatt,* 87 Cal. 248; *Barton* v. *Farmers' Bank,* 122 Ill. 352; *Bank of British North America* v. *Ellis,* 2 Fed. Rep. 48; *Bank of Colfax* v. *Anglin,* 33 Pac. 1056; *Seaton* v. *Scovill,* 26 Am. Rep. 779; 1 Daniel, Neg. Inst. (3d

Ed.), p. 70 ; Black, Interpretation of Laws, pp. 252, 254, 261-3, 265-7 ; Sutherland, Stat. Const. Secs. 206, 207, 408, 409, 482 ; U. P. Ry. Co. v. De Busk, 13 Am. St. Rep. 221 ; Lane v. White, 21 Atl. 437 ; Judkins v. Taffe, 27 Pac. 221 ; Dobbins v. Bank, 112 Ill. 553 ; Jackson v. Warren, 32 Ill. 339 ; Smith v. Stevens, 82 Ill. 554 ; Hudler v. Golden, 36 N. Y. 446 ; People v. Spicer, 99 N. Y. 225 ; Cullerton v. Mead, 22 Cal. 98 ; Quackenbosh v. Reed, 102 Cal. 494 ; Fisher v. Hervey, 6 Colo. 16.)

The Act of March 3, 1899, is entitled to be judged by the general rules of construction independent of Section 4651 of the Civil Code. An act of the legislature cannot control the acts of subsequent legislatures, nor bind them, nor prevail over their intention. (1 Cooley's Blackstone, 90 ; In re Madeira Irrig. Dist., 92 Cal. 296.) Nor can it be logically contended that this conclusion is obnoxious to the principle of the integrity of contracts or that it violates any vested rights. No man has a vested right in a rule of procedure ; legislatures may change the proceedings of courts to suit their convenience, and unless such change acts as an absolute denial of all rights it is not open to complaint. (Sutherland, Statutory Construction, Sec. 483, et cit.) The following cases are analogous to the case at bar and are decisive of this question, in our opinion : Tompkins v. Forestal, 55 N. W. 813 (Minn.) ; Jackson v. Lamphire, 3 Peters, 280 ; Satterlee v. Matthewson, 2 Peters, 406 ; Sampeyreac v. U. S., 7 Peters, 220 ; Ewell v. Daggs, 108 U. S. 150 ; Gross v. U. S. Mortgage Co., 108 U. S. 488 ; Mason v. Haile, 12 Wheaton, 370 ; Drehman v. Stifel, 8 Wall. 595, affirming 97 Am. Dec. 268 ; Insurance Co. v. Talbot, 3 Am. St. Rep. 655 ; Gage v. Stewart, 11 Am. St. Rep. 116 ; Wistar v. Foster, 24 Am. St. Rep. 241 ; Summers v. Mitchell, 30 Am. St. Rep. 106 ; Shields v. Clifton, Hill Land Co., 45 Am. St. Rep. 704 ; Donley v. Pittsburgh, 30 Am. St. Rep. 738 ; Whitney v. Pittsburgh, 30 Am. St. Rep. 740 ; Belleview v. Peacock, 25 Am. St. Rep. 55 ; Richman v. Muscatine Co., 14 Am. St. Rep. 308 ; Judkins v. Taffe, 27 Pac. 221 ; Oullahan v. Sweeney, 79 Cal. 537 ; Gordon v. San Diego, 101 Cal. 522 ; Dunne v. Mastick, 50 Cal.

244; *Cummings* v. *Howard,* 63 Cal. 503; *Dentzel* v. *Waldie,*
30 Cal. 139; *Wood* v. *Westborough,* 140 Mass. 403; *Simmons*
v. *Hanover,* 23 Pick. 192-3; *Kempton* v. *Saunders,* 130 Mass.
236; *Lyman* v. *B. & W. R. R. Co.,* 4 Cushing, 288; *Tate* v.
*Stoolzfoos,* 16 Am. Dec. 546; *Duanesburgh* v. *Jenkins,* 57 N.
Y. 191; *People* v. *Supervisors,* 70 N. Y. 233; *Van Rensselaer*
v. *Snyder,* 13 N. Y. 299; *Morse* v. *Gould,* 1 Kernan (N. Y.),
281; *Stocking* v. *Hunt,* 3 Denio (N. Y.), 274; *Conkey* v. *Hart,*
14 N. Y. 22. See, also, Civil Code, Secs. 4240, 2204, 4604;
*Manderville* v. *Bank,* 9 Cranch, 9; 1 Daniel's Negotiable In-
struments (3d Ed.), Secs. 106-107; 1 Randolph on Commercial
Paper, Sec. 177.

Statements made by a client to his attorney in the presence
of third parties, or to third parties in the presence of his attor-
ney, are not privileged because they have by the act of the client
been given publicity. (*Satterlee* v. *Bliss,* 35 Cal. 507; *Chirac*
v. *Reinicker,* 11 Wheat. 280; 1 Greenleaf on Evidence, Sec.
245; 3 Jones on Evidence, Sec. 770 and note 14; 3 Jones on
Evidence, Sec. 774; Weeks on Attorneys, Sec. 151, pp. 280-
282; Weeks on Attorneys, Sec. 159, p. 289.; Note to 15 Am. St.
Rep. 818 *et cit.; Micheal* v. *Foil,* 6 Am. St. Rep. 577; *Goodwin
Gas Co. Appeal,* 1 Am. St. Rep. 696; *House* v. *House,* 1 Am.
St. Rep. 570; *Cady* v. *Walker,* 4 Am. St. Rep. 834.)

The court having sustained an objection to the competency
of the witness based upon his supposed professional relationship
with the defendant, it became of no moment what were the terms
of the offer of proof, or whether any offer was made. It will
be presumed under these circumstances that the testimony was
material, competent and relevant to the issue. (*McGinniss* v.
*State,* 31 Pac. 978; *Owens* v. *Frank,* 53 Pac. 282.)

The instruction of the court upon the question of the con-
sideration of the note was erroneous. (*Beath* v. *Chapoton,* 115
Mich. 506; *Thorn* v. *Pinkham,* 84 Maine, 101; *Mascolo* v. *Mon-
tesanto,* 29 Am. St. Rep. 170.)

Mere threats, to which no one pays serious attention, which
put no one in fear, which arouse no just apprehension, are not

sufficient to avoid a contract. (*Barrett* v. *Mahnken*, 71 Am. St. Rep. 953; 6 Am. & Eng. Ency. Law (1st Ed.), p. 64 *et cit.*; *Adams* v. *Stringer*, 78 Ind. 175.)

If there be no reason for the prosecution, one threatened unjustly has his remedy at law, and if there be reason for the prosecution, then the threat of such is not a threat of unlawful imprisonment, and the holding out to one of the alternative of prosecution or fair dealing does not constitute duress and will not avoid a contract. (*Beath* v. *Chapoton*, 115 Mich. 506 *et cit.*; *Wolff* v. *Bluhm*, 60 Am. St. Rep. 115; *Thorn* v. *Pinkham*, 84 Maine, 101; *Mascolo* v. *Montesanto*, 29 Am. St. Rep. 170; 6 Am. & Eng. Ency. Law (1st Ed.), pp. 62, 69, 70 *et cit.*; *Town Council* v. *Burnett*, 34 Ala. 400; *Knapp* v. *Hyde*, 60 Barb. (N. Y.), 80; *Buchanan* v. *Sahlein*, 9 Mo. App. 533; *Compton* v. *Bunker Hill Bank*, 96 Ill. 301.)

*Mr. George W. Myers*, for Respondent.

An interpretation that would construe the Act of March 3, 1899, to be remedial would also have to hold that said Act was retroactive, which would be in violation of the mandatory and prohibitive language of the constitution. (Constitution of Montana, Art. III, Sec. 11; *Robinson* v. *Magee*, 9 Cal. 81; *People* v. *Bond*, 10 Cal. 162, 572; *Garland* v. *Lewis*, 26 Cal. 46; *People* v. *Senter*, 28 Cal. 506. See notes under Sec. 10, Art. I, Constitution U. S.; *Dewey* v. *Lambier*, 7 Cal. 347; *Cohen* v. *Davis*, 20 Cal. 195; *Billings* v. *Hall*, 7 Cal. 1; *Tuolume Redemption Co.* v. *Sedgewick*, 15 Cal. 515; *Hibernia S. & L. Soc.* v. *Hayes*, 56 Cal. 303; *Pignaz* v. *Burnett*, 119 Cal. 157.)

The note in suit is a non-negotiable note, made so by the provisions of the Civil Code which were in force at the time the note was made. (Civil Code, Secs. 3991, 3992, 3994, 3996, 3997; *Adams* v. *Semans*, 82 Cal. 636; *Stadler et al.* v. *First National Bank of Helena*, 22 Mont. 190; *Bank* v. *Babcock*, 94 Cal. 96; *Bank* v. *Basuier*, 12 C. C. A. 517, 65 Fed. 58.)

When a legislature borrows a statute from another state, the legislature will ordinarily be presumed to have adopted the statute with the interpretation theretofore given it by the courts of that state. (*Stadler* v. *First Nat'l Bank,* 22 Mont. 190; *First Nat'l Bank* v. *Bell S. & C. Min. Co.,* 8 Mont. 32; *Territory* v. *Sears,* 2 Mont. 324; *Stackpole* v. *Hallahan,* 16 Mont. 40; *State* v. *O'Brien,* 18 Mont. 1, 43 Pac. 1091; *Murray* v. *Heinze,* 17 Mont. 353, 42 Pac. 1057, and 43 Pac. 714; *State* v. *Butte City Water·Co.,* 18 Mont. 199; *Largey* v. *Chapman,* 18 Mont. 563.)

An attorney cannot without the consent of his client be required to answer any questions respecting communications made by his client to him, or upon advice given by the attorney to his client in the course of professional employment. (Code of Civil Procedure, Sec. 3163, Subd. 3; 1 Greenl. Ev. (13th Ed.), Sec. 240 and cases there cited, also Sec. 243; *Gray* v. *Fox,* 97 Am. Dec. 416; Jones on Law of Ev. Secs. 766, 767, and cases cited; *Detrich* v. *Mitchell,* 92 Am. Dec. 101; *Bank of Utica* v. *Mersereau,* 49 Am. Dec. 221.)

A witness cannot be impeached as to collateral or immaterial matter brought out on cross-examination. (*Denver Tramway Co.* v. *Owens,* 36 Pac. 853; *Mullen* v. *McKim,* 45 Pac. 417; 1 Greenl. Sec. 462 *et seq.; Jordan* v. *McKinney,* 144 Mass. 438; *Farnum* v. *Farnum,* 13 Gray, 508; *Kaler* v. *Builders' Ins. Co.,* 120 Mass. 333; *Trambing* v. *Cal. Nav. etc. Co.,* 121 Cal. 144; *Barkley* v. *Copeland,* 86 Cal. 488; *People* v. *Dye,* 75 Cal. 112.)

To sustain an exception to the rejection of evidence counsel should make his offer in such plain and unequivocal terms as to leave no room for doubt as to what is intended. If he leaves the offer fairly open to two constructions, he cannot insist in a court of review on the construction most favorable to himself, unless it is justly inferrable that he was so understood by the judge who rejected the evidence. (*Palmer* v. *McMaster,* 10 Mont. 398; *Chamberlain* v. *Vance,* 51 Cal. 75; *Smith* v. *East Branch Co.,* 54 Cal. 164; *Schroder* v. *Smith,* 74 Cal. 459.)

If our theory of the case is correct and the note in suit is a non-negotiable note, then it is not only incumbent upon appellant to show by a preponderance of the evidence that the note in suit was made by defendant Smith to Donaldson, for a good and valuable consideration, but also to establish by a preponderance of the evidence, all the propositions upon which his case rests. (Bradner on Ev. Sec. 4, p. 343; *Wilder* v. *Cowles,* 100 Mass. 487; *Rossiter* v. *Loeber,* 18 Mont. 372; *Harrington* v. *B. & M. Co.,* 19 Mont. 411; *Wilder* v. *Cowles,* 4 Brown, 100 Mass. 487; *Scott* v. *Wood,* 81 Cal. 398, cited 21 Nev. 349; *Thamling* v. *Duffey,* 14 Mont. 567; *Vosburgh* v. *Diefendorf,* 119 N. Y. 357; 2 Greenl. on Ev. Sec. 172; *Munroe* v. *Cooper,* 5 Pick. 412; *First Nat'l Bank* v. *Green,* 43 N. Y. 298; *Smith* v. *Livingston,* 111 Mass. 342.)

To compound a crime is to agree not to prosecute it when the party so agreeing knows it to have been committed. (Penal Code, Sec. 280; 2 Wharton, Crim. Law (8th Ed.), Sec. 1559; 4 Blackstone's Com. 124-136.) Notes given by the maker for the purpose of stifling prosecution by the payee, of a criminal charge made by them against a third person, are invalid and unenforceable. (*Leggatt* v. *Brown,* 29 Ont. Rep. 530; *Commonwealth* v. *Pease,* 16 Mass. 91; *Ream* v. *Sauvian,* 43 Pac. 982; *First Nat'l Bank* v. *Greeg,* 1 Mo. A. Repr. 293; *Murphy* v. *Bottomer,* 40 Mo. 67; *Cheltenham F. B. Co.* v. *Cook,* 44 Mo. 29; *Owen* v. *Green,* 45 S. W. 84; *McCormick Harvesting Co.* v. *Miller,* 74 N. W. 1061; *Sylvester-Bleckley Co.* v. *Goodwin,* S. E. Rep. 3.)

It is not incumbent upon defendant to establish by a preponderance of all the evidence that he was actually put in fear of prosecution for grand larceny or of death or of bodily harm, but it is upon the plaintiff to make out his case by a preponderance of the evidence and to entirely overcome the presumptions arising from the evidence produced by defendant. (*Rossiter* v. *Loeber,* 18 Mont. 372; *Vosburgh* v. *Diefendorf,* 119 N. Y. 365.)

Where the evidence is conflicting, an order denying a new trial will not be reversed on the ground that the evidence does not justify the verdict. (*Beckstead* v. *M. U. Ry. Co.,* 19 Mont. 147; *Harrington* v. *B. & B. M. Co.,* 19 Mont. 411; *Crystal Lake Ice Co.* v. *McAulay,* 75 Cal. 631; *Reardon* v. *Patterson,* 19 Mont. 231; *Ray* v. *Cowan,* 18 Mont. 259; *McIntyre* v. *Mc-Cabe,* 19 Mont. 333; *Antoine Co.* v. *Ridge Co.,* 23 Cal. 219; *Matthai* v. *Matthai,* 49 Cal. 90; *Kinna* v. *Horn,* 1 Mont. 598; *Barry* v. *Coughlin,* 90 Cal. 220; *Crosset* v. *Whelan,* 44 Cal. 200; *Heinlen* v. *Heilburn,* 97 Cal. 101; *Reary* v. *Butler,* 95 Cal. 206; *Wilson* v. *Fitch,* 41 Cal. 363; *Johnson* v. *Brown,* 115 Cal. 694.)

MR. COMMISSIONER CLAYBERG prepared the opinion for the court.

Action on promissory note dated November 29, 1898, for $1,000, made, executed and delivered by respondent to one James Donaldson, and transferred to appellant for a valuable consideration before maturity. The note in question was in the following form: "Miles City, Montana, Nov. 29, 1898. $1,000.00. Sixty days, without grace after date I promise to pay to the order of James Donaldson, one thousand dollars, at the First National Bank of Miles City, with interest at ten (10) per cent. per annum from and after M. until paid, for value received with attorney's fees in addition to other costs in case the holder is obliged to enforce payment at law. H. A. Smith. The State National Bank. No. 13,282. [Five revenue stamps —a one, two two's, one five, one ten.]" Indorsed on face: "Protested this 28th day of January, 1899, for nonpayment. Jno. E. De Carle, Notary Public." Indorsed on back: "Pay to W. H. Bullard. James Donaldson. Pay State National Bank or order. W. H. Bullard."

The complaint contained the ordinary allegations in a suit on a promissory note. The answer, after certain denials of allegations of plaintiff's complaint, alleged affirmatively that

Donaldson, by duress, force, and threats, compelled the execu-
tion of the note; that it was without consideration, and that
Donaldson knew that fact; that plaintiff knew that the note
was void at the time of its purchase; and that he was not a *bona
fide* holder. The replication denied all these affirmative allega-
tions, and alleged that the note was executed voluntarily in part
settlement of an existing indebtedness. Upon a trial of the
issues thus raised, a great amount of testimony was introduced,
all of which is set forth in the transcript. Plaintiff made a
*prima facie* case on the trial by the introduction of the note,
proof of a purchase before maturity, and proof of the reasonable
value of the attorney's fees provided for in the note, and then
rested. Defendant was sworn as a witness in his own behalf,
and testified to facts which his counsel insists show that the note
was given under duress, and then rested. Plaintiff then intro-
duced testimony tending to show that he purchased the note
prior to maturity for $900 cash, and that the note was given
Donaldson voluntarily, and in consideration of damages he had
suffered because of the theft of certain of his sheep, with which
it was insisted defendant was connected.

1. The first question to be considered by this court is
whether the note sued upon was negotiable. The court below
held it to be nonnegotiable, and it followed from such holding
that the defendant was entitled to make proof of each and every
defense which he might have asserted, had the suit been brought
by Donaldson, the original payee of the note. If the note was
negotiable, and it appeared that plaintiff obtained it prior to
maturity, for a valuable consideration, and without notice of
the defenses which the defendant might have interposed against
the original payee, he was entitled to recover.

Prior to the passage of the Code of 1895, notes of this char-
acter were negotiable. (*Bank of Commerce* v. *Fuqua,* 11 Mont.
285, 28 Pac. 291, 14 L. R. A. 588, 28 Am. St. Rep. 461.) By
Sections 3991 to 3997, Civil Code, they were made nonnego-
tiable. Section 3992 provides: "A negotiable instrument must
be made payable in money only, and without any condition not

certain of fulfillment." Section 3997 provides: "A negotiable instrument must not contain any other contract than such as is specified in this article." Section 3996 provides: "A negotiable instrument may contain a pledge of collateral security, with authority to dispose thereof." By virtue of these provisions of the statute, the supreme court held in the case of *Stadler* v. *First National Bank of Helena,* 22 Mont. 190, 56 Pac. 111, 74 Am. St. Rep. 582, that no instrument was negotiable which contained a contract to pay attorney's fees, because of Section 3997, and because a contract of that character is not mentioned in the statute. By the statute of 1895, making such notes nonnegotiable, the legislature provided, in effect, that the maker of a note might plead defenses of the character asserted here in a suit brought by an indorsee or assignee of the note. Thus the statute of 1895 created a defense which the maker might for the first time in this state plead in a suit brought upon a note similar to the one in question by an indorsee or holder thereof. There is no doubt but that the legislature had power to pass this Act, and that it was constitutional in every regard.

The decision of *Stadler* v. *Bank, supra,* was rendered on February 20, 1899. The legislature of Montana was then in session, and passed an Act amending Section 3996 so as to read as follows: "A negotiable instrument may contain a pledge of collateral security with authority to dispose thereof, also a provision for reasonable attorney fee or both." By Section 2 of the same Act, the legislature further provided, "All Acts and parts of Acts inconsistent herewith are hereby repealed." (Laws of 1899, p. 124.) By this action of the legislature, notes which under the statute of 1895, as construed by this court in *Stadler* v. *Bank, supra,* were nonnegotiable, were made negotiable. In effect, the legislature took away from the maker of a note a defense which he was allowed to assert only by virtue of the provision of the Code of 1895.

There is no prohibition in our constitution against retrospective legislation, other than that which is stated in Section 11, Article III, which is as follows: "No *ex post facto* law, nor

law impairing the obligation of contracts, or making any irrevocable grant of special privileges, franchises or immunities shall be passed by the legislative assembly." It follows that the legislature was therefore untrammeled and free, in so far as constitutional provisions were concerned, to pass any retrospective laws which did not violate the obligations of contracts or interfere with any vested rights.

While there is no constitutional provision against retrospective legislation, the Civil Code of 1895, in which the sections above quoted are found, contains these provisions:

"Sec. 4650. This Code takes effect at twelve o'clock noon on the first day of July, 1895.

"Sec. 4651. No part of it is retroactive unless expressly so declared."

We find similar provisions in the Political Code and Code of Civil Procedure, passed at the same time.

We are therefore called upon to construe the amendment to Section 3996, passed by the legislature of 1899, in connection with Section 4651, Code of 1895. By the last-mentioned section the power of the legislature to enact retroactive or retrospective laws is recognized, but a limitation is placed upon the exercise of such power, by requiring that, in case of the passage of such Acts, they must be expressly declared to be retroactive in their operation. We do not find in the amendment of 1899 any express declaration mentioned in Section 4651, that the Act should be retroactive in its operation. A general rule of construction of statutes is that the meaning and intent of the legislature must be arrived at and enforced. ( *United States* v. *Hartwell,* 6 Wall. 385, 18 L. Ed. 830.) In order to arrive at this legislative intent, we must investigate the history of the passage of the Act of 1899. Upon examination of the original bill on file in the office of the secretary of state, we find the following facts:

On January 23, 1899, this Act was introduced in the senate as Senate Bill No. 36, in the following form:

"A Bill for an Act to amend Section 3996, Title XV, Chapter 1, Article 1, of the Civil Code of the State of Montana, relating to negotiable instruments.

"Be it enacted by the Legislative Assembly of the State of Montana:

"Section 1. That Section 3996, Title XV, Chapter 1, Article I, of the Civil Code of the State of Montana, be amended so as to read as follows: Section 3996. A negotiable instrument may contain a pledge of collateral security with the authority to dispose thereof, also a provision for reasonable attorney fee, or both."

On February 6th it was considered by the committee of the whole, and amended as follows: "After the word both 'and the negotiability of all promissory notes and instruments outstanding, and the terms and conditions thereof unfulfilled, at the time this Act takes effect shall be determined and governed by the provisions hereof. Section 2. All Acts and parts of Acts inconsistent herewith are hereby repealed.' "

On February 7th it was passed as amended. It was then referred to the house, where the following action was taken: On February 16th it was reported back by the judiciary committee with an amendment striking out the words "and the negotiability of all promissory notes and instruments outstanding and the terms and conditions thereof unfulfilled at the time this Act takes effect shall be determined and governed by the provisions hereof." On February 24th it was passed by the house as amended therein. It was then transmitted to the senate. February 27th, in the senate, the house amendments were concurred in, and the bill was passed and signed.

It thus conclusively appears from the legislative history of the Act of 1899 that the legislative intent was to make the Act prospective in its operation only. Section 4651 not only applies to the Code of which it is a part, but to all amendments to such Code thereafter made. (Central Pac. R. R. Co. v. Shackleford, 63 Cal. 261; Teralta Land and Water Co. v. Shaffer, 116 Cal. 518, 48 Pac. 613, 58 Am. St. Rep. 194; Dodge v. Nevada Na-

*tional Bank,* 109 Fed. 726, 48 C. C. A. 626; *Ely* v. *Holton,* 15 N. Y. 595.)

The point urged by counsel for appellant, that one legislature cannot limit the power of a subsequent legislature, is not material to this case. The only limitation claimed is based upon the provisions of Section 4651. It is apparent from an examination of this section that it does not seek or purport to limit the power of future legislatures to pass retroactive laws, but merely provides a condition which must be conformed to when by the passage of such Acts it is intended to render them retroactive in operation.

We therefore conclude that the note was nonnegotiable, and was not made negotiable by the Act of 1899.

This conclusion renders it unnecessary to consider the question whether or not, if the legislature had intended to make the Act of 1899 retroactive in its operation, it would have been open to the objection that it impairs the operation of contracts.

Counsel for appellant claim that the note was rendered negotiable under the provisions of Sections 2204, 4240, and 4604 of the Civil Code. We do not find anything in either of these sections, nor in the chapter of the Code upon the interpretation of contracts, which is referred to in Section 4240, which authorizes us to hold that the note in question is negotiable. The language of the note is plain and unambiguous, and seems to express clearly the intention of the parties when it was made. It is a well-settled rule of law that the circumstances under which a contract is made, or the intent of the parties existing at that time, are only material when the contract is ambiguous in some of its terms. If it is plain and unambiguous, it needs no construction, and it is the duty of the court to enforce the contract as made by the parties. It is not alleged or claimed in any of the pleadings that the intention of the parties to the note was not fully and fairly expressed therein, or that the defendant waived, or intended to waive, any benefit conferred by law upon him.

2.   It is next claimed that the court erred in not requiring witness Geo. R. Milburn to answer the following question: "Whose attorney were you at that time?" The witness declined to answer the question because to do so might violate his obligation as an attorney.   Thereupon counsel for appellant made an offer in writing of what he proposed to prove by the witness, which was in the following language:   "Plaintiff offers to prove by this witness, Milburn, that he was the attorney of H. A. Smith, the defendant herein, at the time of the trial of the case of the State against Broadbent, and that he was not discharged as such attorney for said Smith either on October 25, 1898, or on November 25, 1898, or before the trial of the said State against Broadbent, or at all.   This evidence is offered in contradiction of the testimony of said defendant, Smith."   After the offer had been made, the court asked: "Is there any objection to the offer?"   To which counsel for the defendant replied: "We haven't any particular objection, so far as we are concerned, to the offer."   This offer was then shown to the witness, and the court propounded to him the following question: "What do you say to the court now?   Do you feel that, by giving testimony in conformity with the offer which you have read, it would violate your obligation as an attorney?"   To which the witness answered:   "I would say this, if your honor please: Without the express personal consent of Mr. Smith for me to give what may be legal and proper evidence in response to that offer, I shall decline to do so."   Whereupon the court said: "The court will not compel you to do so, then."

Counsel for appellant only argues the alleged error of the court in not requiring the witness to answer the question, and makes no reference to the ruling of the court upon the offer. There is no doubt but the question asked was objectionable upon the ground that it sought to contradict the defendant as to his statements made while on the witness stand.   This is conclusively shown by the reply of appellant's counsel to the question of the court, viz., "What is the object of the testimony?"   "The object of the testimony is this:   Smith testified upon the stand

that Judge Milburn had been his attorney; that he had hired him somewhere about the 16th or 20th of October; that he had discharged him on the 25th of October. This question is preliminary, for the purpose and simply by way of contradiction of Mr. Smith." A reference to the record discloses that the testimony of defendant which it was sought to thus contradict was brought out on cross-examination by plaintiff's counsel. No reference is made to any question of the employment of an attorney by defendant in his direct examination. So that this cross-examination was clearly upon a collateral matter. The rule is well settled that a witness cannot be contradicted as to collateral matters brought out upon cross-examination. (Greenleaf on Evidence, Sec. 462 *et seq.*)

Counsel say that the question was "preliminary, for the purpose and simply by way of contradiction of Mr. Smith." True, such purpose was apparent, but the question was in no sense preliminary to such purpose. If the witness had answered the question by saying that he was Mr. Smith's attorney at that time, this would have been a direct contradiction of Smith's testimony, and, as such, would have been inadmissible. Counsel for appellant, in his argument, very ingeniously maintains that this question was merely preliminary to a purpose to adduce testimony from the witness tending "to show that Smith had in the presence of Judge Milburn, at various times, admitted his complicity in the larceny to Donaldson, and had made repeated offers of settlement." Such purpose was not disclosed in the offer of testimony made, and the law does not permit counsel to thus play "fast and loose." He offered to prove by the witness certain facts. By this offer he confined such facts to the contradiction of the testimony of defendant. He cannot now be allowed to enlarge or extend the scope of such offer beyond the limits then placed upon it. But even if he could, such testimony would have been absolutely inadmissible, because no foundation was laid by the original examination of defendant. We are therefore of the opinion that if error was committed by the court in this regard, which we do not decide, it was not reversible error.

3.   Did the evidence disclose a sufficient consideration for the note in question?   The burden of proof was upon the plaintiff in the suit to show by a preponderance of the evidence that the note was given by respondent to Donaldson upon a good and valuable consideration.   This consideration was claimed by Donaldson to rest upon the following facts, viz.:   In the latter part of September, 1898, some horses and a large number of sheep were stolen from him.   He claims that among the sheep stolen were a large number of ewes, with their lambs; that, upon making a search for these ewes and lambs, he found a portion of the ewes at a point some thirty-five miles distant from his ranch, from which they had been stolen; that he was told by respondent, who aided in the search, that the lambs were on his ranch with a band of sheep, and that they were turned over to him, as he supposed, as his share of lambs from a band of sheep belonging to him or his wife, which one Broadbent was running on shares.   Donaldson proceeded to respondent's ranch, and 560 of these lambs were turned over to him.   He claims that he did not receive back the entire number of sheep and lambs which had been stolen from him.   He then caused the arrest of Broadbent and two other men, by the names of Beatty and Hand.   It seems that Beatty, while confined upon this arrest, confessed to the theft of the sheep and lambs, and implicated respondent in such theft.   Immediately upon the discovery of this, Donaldson saw respondent, and told him of Beatty's disclosure, and accused him of complicity.   Whereupon, according to the testimony of Donaldson, respondent wanted to settle with him, and they concluded a tentative arrangement, which is denied by respondent.   Broadbent was tried at Glendive the latter part of November, 1898.   Donaldson, becoming satisfied during the trial that Broadbent would probably be acquitted, demanded of respondent a settlement of his damages caused by the theft. Upon this settlement, respondent gave Donaldson the note in question, together with others.   As to the circumstances of this settlement, Donaldson's testimony and that of respondent is entirely irreconcilable, but of this we shall speak later.

In regard to the consideration of this note and the others, it is sufficient to say that from the evidence it conclusively appears that certain sheep had been stolen from Donaldson; that he believed respondent was connected in some way with this theft, and was therefore liable for the damages occasioned thereby; that he took the note in question, in part settlement of these damages, from respondent. Under these facts, if true, there can be no doubt but that a good and valuable consideration existed for the note.

4. Respondent claims that the notes were given under duress, and therefore are void.

The defense of duress or menace is based upon the proposition that the consent of the party to the contract over whom it was exercised was not free.

Section 2112 of the Civil Code provides:

"An apparent consent is not real or free when obtained through (1) duress; (2) menace; (3) fraud; (4) undue influence; or (5) mistake."

Sections 2114 and 2115 provide as follows:

"Sec. 2114. Duress consists in (1) unlawful confinement of the person of the party, or of the husband or wife of such party, or of an ancestor, descendant, or adopted child of such party, husband or wife; (2) unlawful detention of the property of any such person; or (3) confinement of such person, lawful in form, but fraudulently obtained, or fraudulently made unjustly harassing or oppressive."

"Sec. 2115. Menace consists in a threat (1) of such duress as is specified in subdivisions 1 and 3 of the last section; (2) of unlawful and violent injury to the person or property of any such person, as is specified in the last section; or (3) of injury to the character of any such person."

According to respondent's testimony, on November 29, 1898, while he and Donaldson were at Glendive, attending the trial of Broadbent, as witnesses, Donaldson came to his room and demanded of him a complete settlement of the damages occasioned by the theft of the sheep, as above stated. His evidence

does not disclose that any warrant had been issued against respondent, upon which he might have been arrested for the theft, or complicity therein. Donaldson threatened respondent at that conversation that, if the settlement was not made, he (Donaldson) would cause respondent's arrest. Respondent says: "I didn't suppose, under my own course, I could be arrested. Still, I had nothing to fear, and after he had made three threats of having me arrested, and so on, and I still said I wouldn't do anything of the kind, and ordered him again out of my room, he got up and walked to the door and says, 'I will not leave this room until I get this thing fixed as I want it, and neither will you.'" It thus appears by respondent's own testimony that he had no fear of arrest. He then continues: "And he put his hand down under his vest and he drew a six-shooter up like that; didn't draw it below like that. Under the circumstances, the man was in a passion—he had passion and whiskey mixed together; and I honestly believe that, if I had not made those notes as I did, that he would have attempted to murder me in that room." Again he says, on cross-examination: "Donaldson said that Broadbent was going to get loose, and he wasn't going to get anything out of him, and he was going to make me put it up. He said he was going to make me put up the amount of $7,000. I asked him what it was for, and he said that he had lost the sheep, and that he had a cinch on me; and I told him the best thing he could do, then, was to go ahead and find out. We argued the point awhile. I don't just remember what was said while we were arguing the question. I know that we talked about the sheep that he said he had lost, and about the condition they were in, and so on. He claimed that he had lost 2,000, and didn't know whether he had lost them out of the one band or the other. Well, after we argued awhile there, he concluded that he would take these lambs of Broadbent's that belonged to me and $3,000 in cash. He thought he was getting it up pretty steep, I suppose, is what induced him to come down from $7,000 to $3,000. He admitted as much, anyway. I said I would give it to him. Well, he goes around there awhile, and

when I told him to go out of the room he said he would go out when he got ready, and he went to the door, and I think he turned the key in it—I am not positive of that—and he pulled out a gun, and said if I didn't make these notes to satisfy him, and fix this thing up so he could get his own, I would never get out of that room. He was standing with his back against the door. I was sitting on the bed. We were probably nine or ten feet apart. He did not point the gun at me. He had it pulled from under the waistband of his pants, and had it in his hand. He made no demonstration with it towards me with the gun, other than that he drew it out. *  *  *  I didn't make the notes at the mouth of the pistol at all. After I consented he stood there and said, 'Will you make these notes now, or not?' and I said that, 'under the circumstances, I believe I will be obliged to,' and he put his gun away then. I don't know what effect this had—his threats—on me physically. They had the effect of getting the notes. I don't think it disturbed me physically very much. I don't know as I was exactly afraid of him, but I believe that he would have executed his threats if I had not complied with them. *  *  *  It did not put me in a tremulous sweat. I am not of a nervous disposition. My nerves were good and steady then. *  *  *  I was not nervous at all at the time I made the notes; had nothing to fear as long as I complied with his request. When I executed them I was not in fear."

In respondent's testimony, which, by the way, was all the testimony given at the trial upon the question of menace or duress, we do not find any denial of his connection with or complicity in the theft, and he bases duress solely upon the fact that Donaldson drew a revolver, and said respondent should not leave the room until the matter was settled; yet he says, "I did not make the notes at the mouth of a pistol at all," and "when I executed them I was not in fear." He places the entire ground of menace upon the threats of Donaldson to have him arrested for the theft of the sheep; yet he nowhere says or even intimates that he claimed or insisted in any manner to Donald-

son that he was not guilty of complicity in or connection with such theft. In this connection it is important to refer to the fact that Donaldson absolutely and unequivocally denies that he ever was in respondent's room at Glendive during the Broadbent trial, except on the night of the 27th of November; that the conversation related by respondent ever occurred; that he had a revolver on his person at that time, or that he ever "pulled it" on respondent. His testimony further discloses that from the time of Beatty's confession, and his detailing the substance thereof to respondent, respondent evinced great anxiety to have the entire matter settled, and importuned him (Donaldson) almost daily for such purpose. He further says that on October 31, 1898, which was subsequent to the confession of Beatty, the respondent gave him in cash, in part settlement of the transaction, $1,000. He details on cross-examination circumstances of the receipt of this money, as follows: "I got this $1,000 for damages done, and he asked me for this note in case this should be found out, and he would give me this money. He says, 'If this is found out, they will know that I was in the sheep-stealing.' He says, 'After this thing blows over, I will give you the note. * * *' I had the $1,000 before he asked that of me. He asked me to do it, and I signed it. I gave him his way all the way through. * * * I signed that note after I had had the money, or after it was supposed to be turned over to me. I don't know which. Before we left the room I signed it." Respondent acknowledged that he gave Donaldson the $1,000 and took his note, and during the trial of the case offered the note in evidence, but insists that it was for money loaned to him at that date. This note is dated October 31, 1898.

The law relative to duress at common law—and it is not materially changed by our statute—is well stated by Judge Walton in the case of *Hilborn* v. *Bucknam,* 78 Me. 482-485, 7 Atl. 272, 57 Am. Rep. 816. In that case the defendants had lost large quantities of meal from their mill, and they had obtained such proof as satisfied them that the plaintiff, in collusion with the

miller, had taken much, if not the whole, of it. After negotiations the plaintiff paid the defendant $1,075 in cash, and gave a secured note for the further sum of $425. Afterwards plaintiff brought suit to recover the sum of $1,075 so paid from the defendant. The court said: "The plaintiff was at no time arrested. He was not in express terms threatened with arrest. It may be true, as contended by his counsel, that he was made to believe that he would be arrested if he did not settle, but no direct threats of arrest were made. But suppose such threats had been made—suppose that, instead of leaving it to inference, he had been told in so many words that if he did not settle he would be prosecuted both civilly and criminally—still, such threats under the circumstances disclosed in this case, would not constitute duress. It is not duress for one who believes that he has been wronged to threaten the wrongdoer with a civil suit. And if the wrong includes a violation of the criminal law, it is not duress to threaten him with a criminal prosecution. It is not to be supposed that a man smarting under a sense of wrong and injury, such as the defendants in this case had suffered, will not use some such threats. It is not in human nature to exercise such restraint. It is unreasonable to expect it, and the law does not require it. The law regards it as the duty of every one who knows of the commission of a crime to take measures to have the offender brought to justice, and it does not involve itself in the absurdity of making it unlawful for one to express to the offender an intention of doing what the law makes it his duty to do. There can be no doubt that the defendants believed, and had reason to believe, that they were sufferers by the plaintiff's wrong. By collusion with their miller, he had taken their corn or meal without their knowledge or consent, and had not accounted to them for it. He knew better than they how much he had taken. He consented to pay them one thousand and seventy-five dollars, and, in the opinion of the court, the evidence fails to disclose any legal or equitable ground for his recovering it back."

In the case of *Higgins* v. *Brown,* 78 Me. 473, 5 Atl. 269, the

court holds that mere threats of criminal prosecution, when no warrant has been issued or proceeding commenced, do not constitute duress. The court say: "There is not any evidence of threats, of impending danger, or personal violence. The threats, as stated by the defendant himself, amounted to nothing more than that the plaintiff was going to commence criminal proceedings. These threats were not connected with any prosecution then pending. No warrant had been issued, or proceedings commenced. Assuming the testimony of the defendant to be true, he does not exhibit such a state of affairs as would constitute duress according to the well-settled rules of law."

The question as to whether respondent was acting under duress in the morning of November 29th, because of Donaldson's acts with reference to the revolver, becomes immaterial in this case, because an examination of the record discloses the fact that the note sued upon was not given by the respondent on the morning of November 29th, but later on the same day, and under other circumstances, as disclosed by respondent in his testimony, as follows: "In the evening he came back into my room after supper, somewhere about seven o'clock on the same day, and said that he wanted the notes made, so that he could realize money readily for them; and I said the same as I did in the morning that I had no ready money, and that I wouldn't have anything more to do with it; and he made the same threats as he made in the morning—threatened to prosecute me and everything as he did in the first place, with the exception of exhibiting the gun—and he also held out the proposition that, if I would give him ready cash, I could make it $500 less. I couldn't see any particular harm in changing it then, even if I had had it in my own way, but I says I had the same threats held over me that I did in the morning, and I changed the $2,000 note. I gave him one note—this note here —for $1,000, due in 60 days, and I gave him another, for $500, due in two years, bearing 5 per cent. interest after maturity, and the agreement was that he would return the $2,000 note over for this one and the $500 note." Donaldson testifies to

the fact that the notes given by Smith on the morning of the 29th of November were not satisfactory to him, and that he took them back to him in the evening, surrendered them, and took new notes, one of which new notes is the note sued upon. So that it appears conclusively from the evidence of respondent that the only duress exercised against him in the evening of November 29th, when the note in question was given, was the same threats which he testifies were made to him in the morning of the 29th. He admits that in the evening no gun "was pulled," and no threat of taking his life was made.

Other significant circumstances were disclosed by the testimony: Respondent testifies that the threats and duress exercised on the morning of the 29th were in a room in a hotel in the town of Glendive. Respondent does not disclose that he made any outcry, or sought in any way or manner to obtain assistance to relieve him from conceived danger. Again, he says, although he had many friends in Glendive, whom he saw immediately after the alleged duress in the room on the morning of November 29th, he did not tell any of them about what had occurred. He says that the only person with whom he consulted was his attorney at Miles City, after he had returned from Glendive. It seems singular to us that, under all these circumstances, if his testimony of the transaction is true, he should have kept absolutely silent about it.

We are satisfied, from all the evidence introduced in the court below, that there is not sufficient evidence to sustain the verdict on the proposition that the note in question was made under duress or threats.

5. The court charged the jury as follows: "You are further instructed that if you should find from a preponderance of the evidence that there was some sheep stolen from the said Donaldson, and that the said Smith was connected with the larceny of the said sheep, and that the said Donaldson did not recover all of his sheep, and was damaged by reason of the larceny, such damage might form a legal consideration for a promissory note; but you are further instructed that if you find from

the evidence that there was connected with the same transaction a promise, either expressed or implied, on the part of Donaldson, not to prosecute or have the defendant, Smith, arrested, then such promise, whether expressed or implied, would vitiate and render null and void the entire transaction, and the note would then be without legal consideration, and it would be your duty to find for the defendant."

It appears that after the jury had retired, and before returning their verdict, they made a request in writing for further instructions, as follows:

"The definition or meaning of the words *expressed or implied.*"

Whereupon the court further instructed the jury as follows:

"'Expressed' means stated or declared in direct terms. That which is made definitely known in direct terms, and not left to implication. It is a rule that, when a matter or thing is expressed, it ceases to be implied by law.

"'Implied' is defined as contained in substance or essence, or by fair and reasonable inference or deduction, but not actually expressed; deducible by fair and reasonable inference."

The first part of the charge above quoted is correct, but we do not believe that the evidence adduced on the trial warranted the modification thereof found in the latter part of the charge quoted. We do not find in the evidence, after a careful and conscientious search, that any promise on the part of Donaldson that he would not prosecute, or have the defendant, Smith, arrested, was shown in any way or manner. Even the testimony of respondent does not disclose a scintilla of evidence tending to show that Donaldson promised him that, if the settlement was made, the respondent would not be prosecuted or arrested. Nor does it show any language or acts on the part of Donaldson from which such promise could be in any wise implied. So that, from all the testimony given in the case, we are of the opinion that the latter part of the charge above quoted was not based upon any testimony introduced at the trial, and was therefore erroneous. It is quite apparent that the jury con-

sidered the erroneous, part of this instruction in their delibera-
tions, and it is impossible to determine to what extent the ver-
dict was influenced thereby.

6.　The further question for consideration is as to the charge
of the court upon the burden of proof.　The charge, as given,
contains no direct or separate instruction as to the burden of
proof upon the defense pleaded—that the note in suit was exe-
cuted under duress.　By instruction No. 4 the jury was told
that it devolved upon plaintiff to show not only that he secured
the note in good faith and for a valuable consideration, but also
that the note was made by defendant. for a good and valuable
consideration.　Instruction No. 6 was in the following form.:
"The jury are further instructed that the burden of proof in
this class of cases is always upon the party holding the affirma-
tive.　That would be upon the plaintiff in this action.　And you
are instructed that any matter asserted by one party and denied
by the other can only be proved in law by a preponderance of
the evidence.　If you find that the evidence bearing upon the
plaintiff's case is evenly balanced, or that it preponderates in
favor of the defendant, then the plaintiff cannot recover, and
you should find in favor of the defendant."　The court refused
plaintiff's instructions Nos. "h" and "i," requested upon the
question of duress; being misled, possibly, by the language of
this court in the case of *Rossiter* v. *Loeber,* 18 Mont. 372, 45
Pac. 560.　　:

By this action we are led to believe that, in the view of the
court below, the burden was upon the plaintiff to show by a pre-
ponderance of evidence, in addition to the matters specified in
instruction No. 4, or as included therein, that the note sued
upon was executed without duress.　In this view the court was,
in our opinion, wrong, but blamelessly so, because of the some-
what careless and inaccurate language of this court used in the
case of *Rossiter* v. *Loeber, supra.*　There is no doubt but that,
when a suit is brought by an indorsee or assignee of a nonnego-
tiable note, the burden of proof is upon him to show that the
note was originally issued upon a valuable consideration, and

that he is a *bona fide* holder thereof; but, in our judgment, there is no warrant in the law for holding that the burden is also upon him to show that no other defense existed to the note.

This court, in *Rossiter* v. *Loeber, supra,* said: "Written obligations, whether for a debt due or not, made under such circumstances, will not be enforced at the instance of the person who takes them with notice of the circumstances connected with their inception, as plaintiff in this case clearly did, if the maker plead and prove such duress as a valid defense. Duress having been proved on the trial, the question of no consideration is immaterial to the further discussion of the case. Accordingly it was error in the district court to instruct that it was incumbent upon the defendant to establish his defense of duress and compulsion *and* want of consideration by a preponderance of the evidence, and, if he failed to do so, plaintiff should recover. He was not bound to prove both such defenses. Either, if established, would defeat a recovery by plaintiff." Thus far no misunderstanding of what this court meant could arise, but from the following language, which was merely by way of dictum, some confusion might, and doubtless would, arise: "What we have heretofore laid down, namely, that the burden of proving that plaintiff was a holder in good faith was always upon .him, relieved defendant of establishing the defense of duress by a preponderance of evidence. It was always upon plaintiff alone, who acquired this note subject to the defenses which might be interposed by defendant against its payment, to prove his *bona fides,* to entitle him to recover." The opinion in that case, upon careful examination, does not disclose the fact that plaintiff introduced, or even offered, any evidence tending to show that he purchased the note for a valuable consideration in the regular course of business; and it does disclose that he acquired the same with full knowledge of the duress practiced upon the defendant. So that the presumption which attaches to a holder in good faith for a valuable consideration, without notice of defenses, did not arise. Speaking generally, duress, like fraud, may be pleaded as a defense to a contract; but the

burden of proving such defense by a preponderance of the evidence is upon the party alleging it, except under special circumstances, none of which appear in this case. Therefore, if the holdings announced in this opinion are in conflict with those announced in *Rossiter* v. *Loeber, supra,* that case is overruled to the extent of such conflict.

Many other errors are relied upon, but we believe that sufficient has been said to fully present our views of the entire case in such manner as to enable the court below to try the case correctly.

We recommend that the judgment and order appealed from be reversed.

PER CURIAM.—For the reasons given in the foregoing opinion, the judgment and order appealed from are reversed, and the cause remanded.

MR. JUSTICE MILBURN, disqualified.

