PARHAM, Respondent, *v.* CHICAGO, MILWAUKEE & ST.
PAUL RY. CO., Appellant.

(No. 4,102.)

(Submitted February 26, 1920.  Decided April 8, 1920.)

[189 Pac. 227.]

*Carriers — Livestock —Contracts—Custom—Evidence—Claim
of Loss—Measure of Damages—Harmless Error.*

Carriers—Livestock—Contract of Carriage—Ambiguity—Parol Evidence
1. Where a contract of carriage of livestock provided that transportation should be had to a named station in another state, and from thence *via* a given carrier and connections "to ——" station, consigned to D., an ambiguity as to destination existed which could be explained by parol testimony.

Same—Liability for Negligence of Connecting Carrier.
2. In an action for damages flowing from the failure of the carrier of livestock to stop over at a certain station for the purpose of feeding, according to established custom, the carrier could not escape liability by proof that the cause of action arose after the shipment was taken over by a connecting carrier, where the shipper was charged through rates from the point of shipment in Montana to destination in another state, its liability in this respect being unaffected by the fact that the person in charge of the stock signed a new contract with the connecting carrier.

Same—Livestock—Failure to Stop and Feed—Custom—Evidence.
3. Where a contract for the shipment of livestock was made with reference to a custom not mentioned therein, to stop over at a certain point for feeding, proof of the custom was admissible for the purpose of ascertaining the intent or understanding of the parties, and was not objectionable as tending to vary by parol the terms of the writing.

Custom—Evidence.
4. While usage or custom cannot make a contract where none has been made, general usage affecting any branch of business furnishes good evidence of what is regarded as right and reasonable in the premises.

Pleading and Practice—Admissions—What may Constitute.
5. An allegation in an answer that a fact stated in the complaint is true, or the affirmative statement therein of a fact which is likewise pleaded in the complaint, is an admission of the truth of the allegation of the complaint, and proof thereof is not necessary.

Carriers—Livestock—Authority of Attendant—Jury Question.
6. *Held,* that the question whether the person in charge of a livestock shipment, or "shipper," so styled by plaintiff, had ostensible authority to direct the conductor in charge of the train not to stop for feeding at a certain station, contrary to an established custom, or was acting as a mere special agent with no other authority than to act as attendant, was one for determination by the jury.

Same—Notice of Claim of Loss—Secondary Evidence—Harmless Error.
7. Where there was a valid proof of service of notice of claim for loss on the connecting carrier within the time fixed by the contract

of carriage, error in admitting secondary evidence thereof, without demand on defendant to produce the original, was not prejudicial.

Same—Purpose of Notice of Claim of Loss—Measure of Damages.

8.   The notice of claim of loss sustained in transportation by a shipper of livestock is to enable the carrier to make investigation as to the situation and conditions existing at the time and in order that there may be, no unreasonable delay in bringing action, and does not bar recovery of a larger amount than that stated in it, except, perhaps, where the sum claimed has been tendered in settlement.

*Appeal from District Court, Yellowstone County; George W. Pierson, Judge.*

ACTION by Owen B. Parham against the Chicago, Milwaukee & St. Paul Railway Company. From a judgment for plaintiff, and an order denying a motion for new trial, defendant appeals. Reversed and remanded.

*Mr. H. H. Field,* of the Bar of Illinois, and *Mr. Geo. W. Farr,* for Appellant, submitted a brief; *Mr. Farr* argued the cause orally.

What is the liability of the appellant railway company for not stopping the shipment in question at Stockdale for feeding purposes? Recovery is sought under the Act of Congress generally known as the Carmack Amendment of June 29, 1908, as subsequently amended. This amendment only imposes liability for some default in a carrier's common-law duty, and not liability in an insurer. (*Adams Express Co.* v. *Croninger,* 226 U. S. 491, 44 L. R. A. (n. s.) 257, 57 L. Ed. 314, 33 Sup. Ct. Rep. 148; *Chicago etc. Ry. Co.* v. *Latta,* 226 U. S. 519, 57 L. Ed. 328, 33 Sup. Ct. Rep. 155 [see, also, Rose's U. S. Notes].)

It was never intended that the Carmack Amendment should make the initial carrier absolutely liable, independent of negligence, but it merely permits the shipper to recover without the burden of locating the particular company negligent, and to annul stipulations usual in bills of lading limiting liability of connecting carriers to damages on their own lines. (*Pecos & N. T. Ry. Co.* v. *Meyer* (Tex. Civ. App. 93), 155 S. W. 309.)

In an action under the Carmack Amendment, the plaintiff must produce the bill of lading, if one was issued, or he cannot

recover. (*Burtless* v. *Oregon S. L. Ry. Co.*, 180 Ill. App. 249.) The bill of lading issued to Farmington only, at which point another bill of lading was issued by the Rock Island & Pacific Railway Company for the carriage of the sheep to Chicago, Illinois. This was a new contract entirely separate and independent of that entered into with the appellant railway company, and one to which that company was not a party. We submit that the obligation of the Chicago, Milwaukee & St. Paul Railway Company ceased when the sheep reached Farmington. (*Barrett* v. *Northern Pac. Ry. Co.*, 29 Idaho, 139, 157 Pac. 1016; *Parker-Bell Lumber Co.* v. *Great Northern Ry. Co.*, 69 Wash. 123, 41 L. R. A. (n. s.) 1064, 124 Pac. 389.) The liability of the initial carrier cannot be extended beyond the contract, evidenced by the bill of lading, to deliver the shipment at the place of destination therein named. (*Parker-Bell Lumber Co.* v. *Great Northern Ry. Co.*, *supra;* *Ross* v. *Maine Cent. R. Co.*, 112 Me. 63, 90 Atl. 711.)

Should the court hold that there was an obligation resting upon the Chicago, Rock Island & Pacific Ry. Co. to stop at Stockdale, for the failure of which the appellant would be responsible, we then submit that the plaintiff could not recover if the person in charge of the shipment (possessing the authority not only presumed to be possessed by such person, but also the authority which appellant offered to prove he actually did possess), directed that the sheep be not stopped. (*Wabash R. Co.* v. *United States*, 178 Fed. 5, 21 Ann. Cas. 819, 101 C. C. A. 133; *Atchison, T. & S. Ry. Co.* v. *United States*, 178 Fed. 12, 101 C. C. A. 140; *Jennings* v. *Grand Trunk Ry. Co.*, 127 N. Y. 438, 28 N. E. 394; *Armstrong* v. *Chicago etc. Ry. Co.*, 53 Minn. 183, 54 N. W. 1059; Hutchinson on Carriers, 2d ed., secs. 84a, 159, 265, 266, 457; Elliott on Railroads, 2d ed., secs. 212, 1408.)

When the shipper accompanies the property, the burden is upon him of showing that the damage did not result from any fault of his own in loading or caring for the stock, and, as a general rule, he must also show such a state of facts as makes

out a *prima facie* case of negligence on the part of the defendant. (*Colsch* v. *Chicago etc. Ry. Co.*, 149 Iowa, 176, Ann. Cas. 1912C, 915, 34 L. R. A. (n. s.) 1013, 127 N. W. 198; 4 Elliott on Railroads, 2d ed., 1549.)

*Mr. F. B. Reynolds,* for Respondent, submitted a brief, and argued the cause orally.

The plaintiff, having directed the shipment to stop at Stockdale, it was the duty of defendant company and its connecting carrier to comply with such directions, even though not included within the express written contract. (Rev. Code, sec. 5307; 10 C. J. 81–83; *St. Louis & S. F. Ry. Co.* v. *Wm. Bondies & Co.* (Okl.), 166 Pac. 179; *Ryan* v. *Great Northern Ry. Co.*, 90 Minn. 12, 95 N. W. 758; *Wente* v. *Chicago etc. R. Co.*, 79 Neb. 179, 15 L. R. A. (n. s.) 756, 115 N. W. 859; *Fort Worth etc. Ry. Co.* v. *Caruthers* (Tex. Civ.), 157 S. W. 238; *Sharp* v. *Clark*, 13 Utah, 510, 45 Pac. 566; *Atchison etc. Ry. Co.* v. *Schriver*, 72 Kan. 550, 4 L. R. A. (n. s.) 1056, 84 Pac. 119; *Colbath* v. *Bangor etc. R. Co.*, 105 Me. 379, 134 Am. St. Rep. 569, 74 Atl. 918; *Western etc. R. Co.* v. *Exposition Cotton Mills*, 81 Ga. 522, 2 L. R. A. 102, 7 S. E. 916; *Wright etc. Wire Cloth Co.* v. *Warren*, 177 Mass. 283, 58 N. E. 1082; *Pavitt* v. *Lehigh Valley R. R.*, 153 Pa. St. 302, 25 Atl. 1107; *Texas & N. O. R. Co.* v. *Davis-Fowler Co.*, 63 Tex. Civ. 242, 133 S. W. 309; *Michigan etc. R. Co.* v. *Day*, 20 Ill. 375, 71 Am. Dec. 278.)

The Carmack Amendment provides that the carrier "receiving property for transportation from a point in one state to a point in another state, shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injuries to such property caused by it." Thus, it will be seen that the criterion of liability is not whether there was one or more contracts in the course of the transportation or whether by one company or by two, but is whether or not the initial carrier received the property for transportation from a point in one state to a point in another state.

The evidence in the case at bar is undisputed that the shipment was delivered to the defendant company for transportation to Chicago, and not to Farmington. The contract to Farmington was made simply for the matter of convenience between the carriers, and was a matter over which the shipper had no control whatever and in which he had no interest. The shipment was made upon the through rate from Harlowton to Chicago, which in itself imports an undertaking on the part of the defendant company to transport the shipment to its ultimate destination at Chicago. (*Savannah, F. & W. R. Co.* v. *Commercial Guano Co.,* 103 Ga. 590, 30 S. E. 555; *Pittsburg etc. R. Co.* v. *Bryant,* 36 Ind. App. 340, 75 N. E. 829; *Eckles* v. *Missouri P. R. Co.,* 112 Mo. App. 240, 87 S. W. 99; *Mann* v. *Birchard,* 40 Vt. 326, 94 Am. Dec. 398.)

Liability of initial carrier for damages due to the negligence of connecting carrier is not affected by the fact that the initial carrier issued a contract for transportation to the end of its line only, and there delivered the goods to connecting carrier, which made a new contract for carrying the shipment over its own line. (*Louisville & N. R. Co.* v. *Scott,* 219 U. S. 209, 55 L. Ed. 183, 31 Sup. Ct. Rep. 171 [see, also, Rose's U. S. Notes]; *Houston & T. C. R. Co.* v. *Lewis,* 103 Tex. 452, 129 S. W. 594; *Texas Cent. Ry. Co.* v. *Hico Oil Mill,* 62 Tex. Civ. 620, 132 S. W. 381; *Chesapeake & Ohio R. Co.* v. *National Bank of Commerce,* 122 Va. 471, 95 S. E. 454; *Atlantic Coast Line R. Co.* v. *Riverside Mills,* 219 U. S. 186, 31 L. R. A. (n. s.) 7, 55 L. Ed. 167, 31 Sup. Ct. Rep. 164 [see, also, Rose's U. S. Notes]; *Atchison etc. Ry. Co.* v. *Word* (Tex. Civ.), 159 S. W. 375.)

The custodian of a sheep shipment is a special agent, and has no authority except such as is expressly conferred upon him, and carrier is bound, at its peril, to ascertain the extent of his authority. (31 Cyc. 1403; *Southern Ry. Co.* v. *Webb,* 143 Ala. 304, 111 Am. St. Rep. 45, 5 Ann. Cas. 97, 39 South. 262; *Atchison etc. Ry. Co.* v. *Watson,* 71 Kan. 696, 81 Pac. 499; *Lake Shore etc. Ry. Co.* v. *National Live Stock Bank,* 178 Ill. 506,

53 N. E. 326; *Fort Worth & D. C. Ry. Co.* v. *Caruthers* (Tex. Civ.), 157 S. W. 238.)

MR. JUSTICE HURLY delivered the opinion of the court.

Plaintiff alleges the delivery to defendant railway company on November 18, 1915, of five cars of lambs at Harlowton, Montana, for transportation to Chicago, Illinois, "with stop-over at Stockdale, Illinois, for feeding purposes," and that defendant for a valuable consideration contracted to make such transportation and to deliver the lambs at their destination over its own line and the line of the Chicago, Rock Island & Pacific Railway Company, and "issued a through waybill therefor, with provisions for such stopover," all of which was directed by plaintiff at the time of such shipment; that in violation of plaintiff's orders, and contrary to the provisions of said waybill, the Chicago, Rock Island & Pacific Railway Company willfully and negligently failed to stop said sheep at Stockdale, but carried them through that station to Chicago and forced them on the market in a badly shrunken condition, without any opportunity for plaintiff to finish them for the market or for the sheep to regain the shrinkage by feeding at Stockdale as contemplated by him at the time of shipment.

The complaint further alleges that it is customary in shipping sheep to the Chicago market from Montana points to stop over at some station near Chicago for feeding, in order to allow such sheep to regain flesh lost by shrinkage and to be finished for the Chicago market; that sheep are commonly fed at Stockdale for that purpose, and that it was the object of plaintiff in stopping said sheep at said station that they be fed for the purposes above mentioned, all of which was and is known by said railway companies. It is further alleged that the lambs were unloaded in the stockyards at Chicago before plaintiff had any knowledge that they had not been stopped at said station of Stockdale, and that because such stockyards were in quarantine, it was impossible to withdraw the lambs therefrom for

feeding purposes, and therefore that said lambs could be disposed of in no other manner than by sale upon the market for slaughtering purposes. The complaint contains allegations as to the shrinkage asserted to have been lost and as to the gain in weight which would have been made by the lambs, had they been fed at Stockdale, and contains appropriate allegations as to the damages claimed to have been sustained by the plaintiff.

The answer alleges that the only contract entered into between the plaintiff and the defendant for the shipment of the sheep was one in writing denominated as exhibit "A." Further answering, the defendant admits that the sheep were not stopped at said feeding station, and that they were carried on directly to the stockyards at Chicago, and alleges that the failure to stop the sheep at said station was at the special instance and request of the plaintiff, his agents, servants, and employees in charge of the sheep at said time and place, who specifically requested and demanded of the Chicago, Rock Island & Pacific Railway Company, before the sheep arrived at Stockdale, that the sheep should not be stopped at that point, but should pass on directly to the stockyards at Chicago. There are other allegations averring due care in handling the sheep and full compliance with the contract, which, however, in view of the issues presented, it is not necessary to discuss.

The defendant denies the allegations as to the custom in stopping sheep consigned to the Chicago market, at Stockdale, but admits that sheep that are shipped to Chicago for that market are often fed there. The answer further alleges that, had it not been for the request and demand of the plaintiff, his agents, servants and employees, upon the Chicago, Rock Island & Pacific Railway Company, the said sheep would have been stopped and unloaded for feeding, and that by reason of such request the plaintiff is now estopped from asserting or making claim for damages by reason of any loss, damage or injury because of the failure to stop the shipment there. The defendant otherwise denies the material allegations of the complaint and further alleges that plaintiff did not present his claim for any

alleged loss in writing or otherwise, within four months after said alleged injury or damage, as required by the contract exhibit "A." The contract, exhibit "A," recites the delivery of the sheep to the defendant railway company and contains this provision: "Which said livestock has been received by said company for transportation over its lines from Harlowton station to Farmington, Minn., station, thence to be forwarded via c/o C., R. S. & P. Ry. Co. and connections to ——, consigned to Walter Dunbar, upon the following terms and conditions."

The contract further contained a provision that no claim for loss, injury, or damage to the livestock, nor for delay or decline in the market, should be valid unless presented to the company in writing within four months. This contract was signed by W. T. Hart, agent of the railway company, and by one J. McD. Hervey, "Person in Charge of Stock"; also "O. B. Parham, Shipper, by R. E. Gruwell." The only recital in the contract as to the destination of the sheep is the one hereinbefore quoted, and nothing is said concerning stopover privileges at Stockdale. It appears, however, that waybills which were introduced in evidence, issued at Harlowton, contain recitals that the sheep were to be shipped from Harlowton to Farmington, Minnesota, consigned to Walter Dunbar, Chicago, Illinois, care of "C., R. I. & P. Railway Company," and each thereof contained this clause: "Stop to feed at Stockdale, Ill."

R. E. Gruwell, a witness for the plaintiff, testified that he was the agent who attended to the billing of the shipment, and that the sheep were "delivered to the railway company at Harlowton to be shipped to Chicago; that is, they were billed to Chicago and fed in transit at Stockdale. Such were the directions given by me to the billing clerk at the time. I got my directions as to the shipment from Mr. Parham."

Testimony was received as to a custom of stopping at Stockdale for the purposes alleged in the complaint, and also testimony as to the shrinkage and gain in weight as alleged in the pleadings, and as to plaintiff's damages. The plaintiff, in addition, introduced in evidence the contract, exhibit "A," attached

to the complaint, and the waybills issued by each carrier. It also appears from the testimony that neither Mr. Parham nor Mr. Gruwell accompanied the shipment, but that Hervey and one Schmeling did so. Mr. Parham testified: "These two persons accompanied the sheep as shippers." When the sheep arrived at Farmington, a new shipping contract was entered into on behalf of the Chicago, Rock Island & Pacific Railway Company, signed by O. B. Parham, by Hervey, "Shipper's Agent." In connection therewith Mr. Parham testified: "Mr. Hervey signed the contract, Plaintiff's Exhibit 'A,' in my behalf."

After the plaintiff rested, the defendant sought to show by the testimony of George Schmeling, above referred to, directions purporting to have been given by Hervey to the conductor to the effect that the shipment should not be stopped at Stockdale. This testimony the court excluded and the defendant then made the following offer of proof:

"Mr. Farr: The defendant now offers to show by the witness on the stand, and that the said witness would testify, that J. McD. Hervey was the person in charge of the shipment of sheep in question from Harlowton, Montana, to Chicago, Illinois; that he was placed in charge of said sheep by the owner, O. B. Parham, through R. E. Gruwell, agent of the owner; that R. E. Gruwell, at the time of the placing of the said J. McD. Hervey in charge of the sheep, had express authority from O. B. Parham to place the said Hervey in charge of the sheep; that before the sheep arrived at Stockdale the said J. McD. Hervey was the person in charge of the sheep, and requested and demanded the conductor in charge of the train of the Chicago, Rock Island & Pacific Railway Company not to stop said sheep at Stockdale, but to go on through without stop, to Chicago," *etc.*

The defendant also offered to prove by the conductor in charge of the train that Hervey had given directions not to stop the sheep at Stockdale, but to take them on to Chicago. The offer of proof was similar to that made when the witness Schmeling was on the witness-stand. The offered evidence was

excluded. Plaintiff recovered judgment, and from the judgment, and an order denying its motion for a new trial, defendant has appealed.

The written contract made at Harlowton does not recite that [1] the sheep were consigned to Chicago, but states: "Which said livestock has been received by said company for transportation from Harlowton station to Farmington, Minn., station, thence to be forwarded *via* c/o C., R. S. & P. Ry. Co. and connections to ——, consigned to Walter Dunbar," *etc.* This created an ambiguity, which we think the plaintiff was entitled to explain by parol testimony, to show that the sheep were consigned to Dunbar at Chicago, if such was the fact, and it is apparent from a reading of the clause that it was the intention of the shipper and the railway company that the sheep should go forward to their ultimate destination from Farmington, *via* the C., R. S. & P. Ry. Co. That this was the intention both of plaintiff and of the defendant is made apparent by the provisions of the waybills, which, while not a part of the contract, afford evidence of what was the agreement. These, as before indicated, contain recitals that the sheep are to be shipped from Farmington, via. the C., R. etc. Ry. Co., to Chicago. We think the court was justified in treating the shipment as one from Harlowton to Chicago, to be handled by defendant and its connecting carrier.

The shipment being a through shipment from Harlowton [2] over the line of defendant and its connections, the defendant may not avoid liability by proof that the cause of action arose after the shipment was taken by the defendant's connecting carrier. The fact that the shipper's agent or person in charge of the shipment signed a new contract at Farmington with defendant's connecting carrier does not change the situation, and this particularly in view of the charging of the through rate from Harlowton to Chicago. (*Missouri etc. R. Co.* v. *Word,* 244 U. S. 383, 61 L. Ed. 1213, 37 Sup. Ct. Rep. 617; *Savannah etc. R. Co.* v. *Commercial Guano Co.,* 103 Ga. 590, 30 S. E. 555; *Pittsburg etc. R. Co.* v. *Bryant,* 36 Ind. App.

340, 75 N. E. 829; *Eckles* v. *Missouri P. R. Co.,* 112 Mo. App.
240, 87 S. W. 99; *Louisville & N. R. Co.* v. *Scott,* 219 U. S.
209, 55 L. Ed. 183, 31 Sup. Ct. Rep. 171 [see, also, Rose's U. S.
Notes]; *Houston & T. C. R. Co.* v. *Lewis,* 103 Tex. 452, 129
S. W. 594; *Chesapeake & O. Ry.* v. *National Bank of Com-
merce,* 122 Va. 471, 95 S. E. 454.)

It is asserted by the appellant that, the contract being silent
[3]  as to stopping the shipment at Stockdale, to regain the
shrinkage, *etc.,* plaintiff's evidence that such was the custom
is an attempt to vary by parol the terms of the written con-
tract.  Our statute provides:

Section 7887, Revised Codes, subdivision 12: "Evidence may
be given upon a trial of the following facts:  *  *  *  Usage,
to explain the true character of an act, contract or instrument,
where such true character is not otherwise plain; but usage is
never admissible, except as an instrument of interpretation."

Section 7877: "For the proper construction of an instru-
ment, the circumstances under which it was made, including
the situation of the subject of the instrument and of the par-
ties to it, may also be shown, so that the judge be placed in
the position of those whose language he is to interpret."

If, as the testimony discloses, it is the custom to stop Montana
shipments of stock to Chicago at Stockdale for feeding, the
plaintiff is not attempting to vary the terms of the contract,
but to explain and interpret the intention of the parties.

"Evidence of usage or custom is not considered in the nature
of parol evidence to contradict or vary the legal import of a writ-
ten agreement, but is received for the purpose of ascertaining
the intent and understanding of parties, by their contracts,
which are made with reference to such usage or custom.  The
use of such evidence is confined, however, to cases where the
intent is not clearly expressed in the contract, for it is to be
remembered that usage cannot make a contract where there is
[4]  none.  Where there is an absence of clear stipulations in
contracts, the usage may be proved to show the actual intent
and purpose of the parties.  General usage affecting any

branch of business furnishes good evidence of what is regarded as right and reasonable in that respect.

"Where a custom does not contradict or is not inconsistent with the terms of a contract, it may be invoked to introduce a new element not expressly employed in the contract and in reference to which the parties are presumed to have contracted. The reason is that, where there is nothing in a contract to exclude the inference, the parties will be presumed to have contracted in reference to customs and usages prevailing in the particular business and applicable to the contract in question. In other words, a custom or usage, consistent with the terms of the contract, peculiar to the subject matter thereof, known to the parties, and probably intended to be included in the contract, as shown by their situation and purposes, the nature of the subject matter and the attendant circumstances may be shown as an aid to the interpretation of a contract." (Paragraphs 1706 and 1721, Elliott on Contracts.)

In our view, the waybills are not, strictly speaking, a part of the contract, but giving effect to section 7877, *supra,* the plaintiff averring a custom of stopping shipments at Stockdale for feeding purposes, was entitled to show that such custom existed, for the purpose of showing the real character of the transactions had. Further light is thrown upon the situation by the answer of the defendant, in which it is alleged that "had it not been for the request and demand made by the plaintiff's shippers, agents, servants, and employees as aforesaid, upon the Chicago, Rock Island & Pacific Railway Company, not to stop said sheep at said station of Stockdale, Illinois, the said sheep would have been stopped there and unloaded for feeding."

While the answer elsewhere denies that it was the intention [5] of the parties that the stock were to be fed at Stockdale, as said in the case of *O'Donnell* v. *Butte,* 44 Mont. 97, 119 Pac. 281: "An allegation in an answer that a fact stated in the complaint * * * is true, or the affirmative statement in the answer of a fact which is likewise pleaded in the complaint, is an admis-

sion of the truth of the allegation of the complaint, and proof
is not necessary."

As to the authority of the person in charge of the stock to
[6] give directions for its handling, we have not been cited to
a case directly in point, and have been unable to find any such
in our own investigations. The contract does not fix his duties,
nor furnish any statement as to the authority conferred upon
him. The contract designates him as "person in charge of
stock." Mr. Parham, the plaintiff, testified that Hervey and
Schmeling went with the sheep as "shippers." Hervey, the
"person in charge of stock," signed the new contract, made at
Farmington, in the name of Mr. Parham. In connection there-
with Mr. Parham testified: "He signed in my behalf."

One Weitz, station agent of the Rock Island at Stockdale,
and in charge of the stockyards there, whose deposition was
taken in behalf of plaintiff, by whom it was offered in evidence,
testified: "I received notice that these five carloads of lambs
were to stop at Stockdale on that date from my foreman at
Stockdale. I was afterward told that they were not to feed,
and that the man in charge had ordered them to go through.
I am not sure from whom I received that information, but
think it was from the telegraph operator at Stockdale."

The plaintiff offered in evidence a letter of W. O. Bunger,
general superintendent of freight claims for the Rock Island
Railway, which contained this statement: "Furthermore, it ap-
pears that the man in charge of shipment requested that the
same be forwarded through to destination without unloading
at Stockdale, and such being the case you will readily under-
stand this company was in no way responsible for the shipment
having passed through Stockdale without having been un-
loaded." Mr. Weitz, testifying for the plaintiff, further stated
with reference to custom and handling of sheep at Stockdale:
"The owner determines whether or not they stop. * * *
The owner usually determines how long the sheep shall remain
at the feeding station. * * * In the absence of the owner,

I take orders from whoever was in charge of them." All of the foregoing was a part of plaintiff's case in chief.

On its case, defendant's witness Dietrick, conductor for the Rock Island, in charge of the train handling this shipment through Stockdale, testified: "I have handled livestock trains of western livestock from Montana points to the Chicago market off and on for seven years. In most cases in the shipment of stock there is some person in charge of the shipment, and as conductor of the train I receive my instructions and directions as to the handling of the sheep, when the owner is not along, from the man in charge."

The trial court, as above noted, excluded evidence as to any directions given by Hervey to the conductor concerning stopping the sheep at Stockdale, upon the ground that he was a mere special agent of the plaintiff, and had no authority to give orders concerning its diversion or handling.

Respondent cites us to the following authorities in support of his contention that the custodian of a shipment is a mere special agent, and has no authority except such as is expressly conferred upon him, and that the carrier is bound, at its peril, to ascertain the extent of his authority: 31 Cyc. 1403; *Southern Ry. Co.* v. *Webb,* 143 Ala. 304, 111 Am. St. Rep. 45, 5 Ann. Cas. 97, 39 South. 262; *Atchison etc. Ry.* v. *Watson,* 71 Kan. 696, 81 Pac. 499; *Lake Shore etc. Ry. Co.* v. *National Live Stock Bank,* 178 Ill. 506, 53 N. E. 326; *Ft. Worth & D. Ry. Co.* v. *Caruthers* (Tex. Civ. App.), 157 S. W. 238.

In *Southern Ry. Co.* v. *Webb, supra,* plaintiff, the owner of hogs, consigned the same to Atlanta, Georgia. Robinson, his employee, who delivered the hogs to the railway company for shipment, at the time of delivery entered into a contract differing from that made by plaintiff with the railway company, changing their destination and the name of the consignee. It was shown that Robinson's duties were simply to deliver the hogs to the railway company and that he was without any other authority. The court held he was a mere special agent, and

that the company was charged with knowledge of the extent of his authority.

In *Atchison etc. Ry. Co.* v. *Watson, supra,* Watson, the owner of cattle, shipped the same to St. Louis from a point in Kansas, and for damages by reason of a delay in handling the shipment he brought action. It was shown that a son of the plaintiff accompanied the cattle, and, at the time they were loaded upon the cars, signed his father's name to a printed contract purporting to be that under which the shipment was made, and to supersede any prior agreement. The terms of this written contract precluded a recovery, if the son executed it under such circumstances as to bind the plaintiff. The defendant contended that under the admitted facts the son was the father's agent for that purpose, or at all events the company was justified in so treating him, and that the court should have so instructed. On appeal the supreme court held the question of authority of the son was for the jury's determination.

In *Lake Shore Ry. Co.* v. *National Livestock Co., supra,* it is merely held that, where a purchasing agent consigns cattle bought by him to his principal, he cannot afterward, while they are in transit, change their destination, nor confer a right to make such change on another.

In the case of *Fort Worth & Denver Ry. Co.* v. *Caruthers, supra,* Caruthers had shipped cattle from a point in New Mexico consigned to Fort Worth, Texas. The first carrier conveyed the cattle to Amarillo, and from there they were taken by another carrier to Fort Worth. The owner contended that at the time of shipping the cattle it was agreed that they should be stopped at Amarillo, to await his further instructions before taking them on to Fort Worth, so that he might avail himself of other markets if the Fort Worth market was not satisfactory. It appeared from the evidence that at Amarillo the connecting carrier insisted on taking the cattle forward over the protest of the person in charge of the stockyards; also, that the cattle were in charge of one Davis as caretaker, and that Davis finally signed a new bill of lading for the transportation

of the cattle from Amarillo to Fort Worth. In discussing the case, the court said: "The facts are practically undisputed that the cattle were to be stopped at Amarillo, and that they were not to be moved therefrom until Caruthers arrived or until the shipper heard from him. Appellant knew of this order from the owner, and, when it and the shipper shipped the cattle, it knew that it was doing so without authority from the owner and over his direction. It was charged with full knowledge of the scope of the agent's authority. It was at least a proper question for the jury, and if they found that the shipper consented to the shipment of the cattle over his instructions from the owner, and that appellant knew he was not authorized to do so, or if he knew his instructions forbade his doing so, then it became a party to the wrong, and cannot justify itself on the ground that it procured the consent of the agent in charge of the cattle. If the evidence made it clear that the shipper had authority to deliver the cattle for appellant, or that appellant did not know that they were to be held at Amarillo, then it might be contended that the appellant was warranted in presuming the shipper had authority to reship the cattle." (*Gulf etc. Ry. Co.* v. *White* (Tex. Civ. App.), 32 S. W. 322.)

In *Gulf etc. Ry. Co.* v. *White* (Tex. Civ. App.), 32 S. W. 322, White, the owner of the cattle, shipped the same over the line of the defendant railway company. In his complaint he did not sue on a written contract, but the defendant by answer alleged that the cattle were shipped under written contracts executed by the plaintiff, acting through certain alleged agents. The plaintiff by reply denied the authority of anyone to execute the contracts referred to. The written contracts pleaded by the defendant were shown to have been executed in plaintiff's name by certain of his employees sent by him with the shipment of cattle. Plaintiff testified that he sent said employees to take care of the cattle, and that he paid the through rate of freight in advance to the first carrier, and that he gave his employees no authority to sign any contracts. When the cattle reached Fort Worth they were delivered to the defendant rail-

way company under contracts then signed by the employees. The court said: "If it had been made clearly to appear that the employees who accompanied the cattle had authority to deliver them to appellant for shipment, then authority to execute the written contracts of shipment might be presumed. (*Ryan* v. *Railway Co.*, 65 Tex. 13 [57 Am. Rep. 589].) But in this respect the case does not appear to be well developed. In fact, it is not definitely shown by whom the cattle were delivered to appellant. We therefore think the court erred in assuming that the contracts were executed by appellee's authority, and hold that that question should have been submitted to the jury. In so ruling, we do not mean to say that the evidence bearing on the question will not support a finding that the authority existed. We are aware of the rule that holds that, although no express authority be given to do a particular act, yet, if such act be within the apparent scope of the agent's authority, his act will bind his principal. But whether or not the act be within the apparent scope of the authority given is, it seems to us, a question of fact for the jury to decide." (See, also, *Waldron* v. *Fargo*, 170 N. Y. 130, 62 N. E. 1077.)

It will be observed, from the foregoing, that in each of the cases cited the question of the agent's authority and whether he acted within its apparent scope was held to be a question for the jury. Here we also have the testimony of Mr. Parham that Hervey accompanied the stock as "shipper." The trial court adopted the view that Hervey was at most a special agent. We think, however, that it cannot be said as a matter of law that one who accompanies a stock shipment, either as "person in charge of stock" or "shipper," is necessarily a special agent. Under the federal statutes such person is given express authority to sign a release to the railway company from liability for failure to unload the shipment for rest, *etc.* By reason of his conduct in contributing to the injury of the stock in his charge, it has likewise been held that the shipper may not recover for injury to the shipment. (*Wabash R. Co.* v. *United States*, 178 Fed. 5, 21 Ann. Cas. 819, 101 C. C. A. 133; *Atchi-*

*son etc. Ry. Co. v. United States*, 178 Fed. 12, 101 C. C. A. 140; *Kansas City etc. Ry. Co. v. McCunningham* (Tex. Civ. App.), 149 S. W. 420; *Fort Worth & D. C. Ry. Co. v. Fort Worth Horse & M. Co.* (Tex. Civ. App.), 180 S. W. 1170; *Jeffries v. C., B. & Q. Ry. Co.*, 88 Neb. 268, 129 N. W. 273; *Eustrom v. N. P. Ry. Co.*, 208 Ill. App. 267.)

The trial court refused to give an instruction, tendered by defendant, to the effect that, if Hervey directed the conductor in charge of the train not to stop the shipment at Stockdale, but to go on through to Chicago, the plaintiff should not recover. In our view, upon the testimony cited herein, with no testimony in contradiction, Hervey ostensibly had authority to give such directions. However, if upon a new trial, from the evidence then adduced, it should appear that Hervey's authority was limited, this fact known to the defendant, or the conditions such that the company should have known he was a mere special agent, with no other authority than to act as a mere attendant, or whether he disobeyed instructions, with knowledge thereof by the railway company, or whether he acted, if at all, within the apparent scope of his authority, are questions of fact for determination by the jury. It is conceded that Mr. Parham himself, if he had accompanied the shipment, could have directed the same to pass through Stockdale without stopping. Whether his agent or "shipper" has similar authority would ordinarily be a question for the jury.

Error is assigned because the court received in evidence over [7] defendant's objection secondary evidence of notice of claim of loss served upon defendant, without a demand for the production of the original having been made upon the defendant. This we think was error. However, there was valid proof of service of notice upon the Rock Island road within the time fixed by the contract, which in itself was sufficient. (*Northern Pac. Ry. Co. v. Wall*, 241 U. S. 87, 60 L. Ed. 905, 36 Sup. Ct. Rep. 493.) The reception of this evidence, therefore, was not prejudicial to the defendant.

Error is assigned because, in instructing the jury as to the
[8]   measure of damages, the court did not limit the recovery
to a sum not exceeding that stated in the notice of claim. A
notice of claim is solely to put the railway company on inquiry
as to the facts upon which the claim is based, so that it may
be informed as to the situation and conditions, at a time when
the evidence may be more easily investigated, and possibly be-
fore recollection of the facts may have disappeared from the
minds of those familiar therewith, and in order that there may
be no unreasonable delay in bringing actions.  That a notice
of claim is for a less sum than the damage actually sustained
should be no bar to recovering the larger amount, except pos-
sibly in cases where the sum claimed has been tendered in set-
tlement.  (See *Pecos & N. T. Ry. Co.* v. *Holmes* (Tex. Civ.
App.), 177 S. W. 505; *Texas & P. Ry. Co.* v. *McMillen* (Tex.
Civ. App.), 183 S. W. 773.)

It is also contended that the court erroneously stated the law
in other respects as to the measure of damages.  However, we
think the instruction was not open to either objection.

Specifications of error are assigned upon other instructions,
which we think it not necessary to specifically discuss, as similar
questions are disposed of herein.

The judgment and order appealed from are reversed, and the
cause remanded for a new trial.

*Reversed.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES HOLLO-
WAY, MATTHEWS and COOPER concur.