COOK ET AL., APPELLANTS, *v.* NORTHERN PACIFIC RY. CO., RESPONDENT.

(No. 4,547.)

(Submitted October 27, 1921. Decided December 19, 1921.)

[203 Pac. 512.]

*Carriers — Livestock Shipments — Parol Testimony — Varying Terms of Contract—Principal and Agent.*

Carriers—Livestock Shipments—Published Tariffs Part of Contract.
    1.  The published tariffs of a carrier, filed with and approved by the Interstate Commerce Commission, requiring a notation on the contract of shipment and the waybills of points at which livestock were to be fed and watered, form a part of the contract of shipment and are conclusive on the shipper (as well as the carrier), whether he has actual knowledge of them or not.

Same—Prior Oral Negotiations Merged in Contract—Parol Evidence—Varying Terms of Writing.
    2.  Prior oral negotiations and directions as to points at which livestock should be stopped for resting and feeding were merged in the contract of shipment, where it and the waybills bore notations stating the points at which stops were to be made, and therefore parol testimony of directions to make other stops was incompetent as an attempt to vary the terms of the written contract.

**Same—Contract—Custom Varying Writing—Evidence—Inadmissibility.**

3. Where the terms of a contract of shipment of livestock were clear and explicit as to where stops should be made for feeding and resting, parol testimony to the effect that it was customary for shippers to have them stop for those purposes at another point was inadmissible.

**Same—Livestock Shipment—Ostensible Authority of Attendant to Change Contract—Evidence—Insufficiency.**

4. A livestock shipment contract on its face bore a notation that the lambs constituting the shipment should be stopped at a certain point for feed and rest. The attendant in charge had no authority, either actual or ostensible, to change the contract in any particular. The published tariffs forming a part of the contract provided that the points at which animals were to be stopped could not be changed otherwise than upon written instruction of the owner or his authorized agent, the question of ownership or agency to be determined by proper identification. The attendant, with the bill of lading in his possession, directed defendant carrier's agent in writing to change the notation as to the place where the stop should be made, stating that he was the person in charge. *Held*, that the burden of proving that the attendant had ostensible authority to make the change in the contract was upon defendant carrier, that the showing made to the agent by the attendant as to his authority to make the change was insufficient, and that therefore the court properly struck all evidence relating to the change.

*Appeals from District Court, Yellowstone County; A. C. Spencer, Judge.*

ACTION by H. G. Cook and another against the Northern Pacific Railway Company. Both parties appeal from the judgment and from orders denying them new trials. Affirmed.

*Messrs. Shea & Wiggenhorn,* for Plaintiffs, submitted a brief; *Mr. Thos. F. Shea* argued the cause orally.

The testimony ordered stricken by the court conclusively established the fact that in all shipments of sheep from Montana and other western states to Chicago, Illinois, there is a well-established custom that such sheep are unloaded for the purpose of feeding and billing at a station outside of Chicago, and that on the Burlington Railroad such station was in Montgomery, Illinois, and also that such custom prevails regardless of whether or not there is any notation to this effect in the shipping contract or in the waybills pertaining thereto. Evi-

---

3. Variation of written contract for shipment of goods by parol evidence, see note in Ann. Cas. 1913A, 932.

dently, in sustaining defendant's motion, the court proceeded upon the theory that such evidence tended to vary the terms of a written instrument. That such was not the effect of the evidence is well established by our statutes and decisions. Likewise, the statutes and decisions of our own state conclusively establish that such evidence is admissible, not for the purpose of varying the terms of a written contract, but to explain the intention and purpose of the parties at the time of the making of such contract. (See sections 5036, 7877 and 7887, Rev. Codes.) The two latter sections were construed in *Parham* v. *Chicago etc. Ry. Co.*, 57 Mont. 492, 189 Pac. 227. In that case the facts and also the questions arising thereupon were substantially identical with the case in question. In that case the shipment was from Harlowton, Montana, to Chicago, Illinois. The contract of shipment was silent upon the ques tion of a stopover at Stockdale. However, there was a notation upon the waybills requiring such stopover. But in passing upon this phase of the case the court stated that the waybills were no part of the contract and were made merely for the purpose of instructing the agents of the defendant railway company. Also in the above case the plaintiff offered evidence establishing the custom of stopping at Stockdale to regain shrinkage, *etc.* Defendant contended that such evidence tended to vary by parol; the court held otherwise.

The reasoning employed by the court in the above case is applicable to the case in question. The plaintiff has pleaded the custom and has established the same by competent evidence and is entitled to have the question of custom and the testimony thereon submitted to the jury. That our statutes and the decisions in *Parham* v. *Chicago etc. Ry. Co.*, above, are in accordance with the general law on the subject, see Corpus Juris, No. 10, page 211, wherein the rule is stated as follows: "Custom as affecting a contract: A custom or usage known to the shipper as to the means or method of transportation will be binding upon the parties as a part of the contract of shipment, when not contrary to its terms"; and see further:

*Savage* v. *Salem Mills Co.,* 48 Or. 1, 85 Pac. 69; *Seavey* v. *Shurick,* 110 Ind. 494, 11 N. E. 597.

*Messrs. Gunn, Rasch & Hall* and *Messrs. Johnston, Coleman & Johnston,* for Respondent and Appellant Railway Company, submitted briefs; *Mr. E. M. Hall* argued the cause orally.

The intent of the parties was clearly expressed in the contract and also in the bills of lading. The provisions of the contract are definite and certain. So the only effect of evidence as to custom or prior oral directions in this case would be to contradict or vary the legal import of an unambiguous written instrument. (*Brockway* v. *Blair,* 53 Mont. 531, 165 Pac. 455; *Frank* v. *Butte etc. Co.,* 48 Mont. 83, 135 Pac. 904.) What was said about the contracts in the cases above applies equally to the livestock contracts here involved. (*Wells Fargo Express Co.* v. *Fuller,* 4 Tex. Civ. 213, 23 S. W. 412; *Marks and Shields* v. *Chicago, R. I. & P. Ry. Co.,* 184 Iowa, 1352, 169 N. W. 764; 10 C. J., sec. 261.) Section 5340 of the Revised Codes provides: "A passenger, consignor, or consignee, by accepting a ticket, bill of lading or written contract for carriage, with a knowledge of its terms, assents to the rate of hire, the time, place and manner of delivery therein stated. But his assent to any other modification of the carrier's rights or obligations contained in such instrument can only be manifested by his signature to the same." (See, also, *Sanden* v. *Northern Pac. Ry. Co.,* 43 Mont. 209, 34 L. R. A. (n. s.) 711, 115 Pac. 408; *Brian* v. *Oregon S. L. R. R. Co.,* 40 Mont. 109, 20 Ann. Cas. 311, 25 L. R. A. (n. s.) 459, 105 Pac. 489; *St. Louis & S. F. Ry. Co.* v. *Ladd,* 33 Okl. 160, 124 Pac. 461.) A written contract supersedes all the oral negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument. (Secs. 5018 and 7873, Rev. Codes; *Kelly* v. *Ellis,* 39 Mont. 597, 104 Pac. 873; *Ford* v. *Drake,* 46 Mont. 314, 127 Pac. 1019; *Armington* v. *Steele,* 27 Mont. 13, 94 Am. St. Rep. 811, 69 Pac. 115; *Pritchett* v.

*Jenkins,* 52 Mont. 81, 155 Pac. 974; *Brockway* v. *Blair,* 53 Mont. 531, 165 Pac. 455.)

The plaintiffs were bound by the act of their agents in signing the livestock contracts. (10 C. J., sec. 187; *Adams Exp. Co.* v. *Carnahan,* 29 Ind. App. 606, 94 Am. St. Rep. 279, 63 N. E. 245, 64 N. E. 647.)

These written orders, signed by the holder of the bill of lading (Dauer), modified the original contracts and waybills, by eliminating the notation to stop for feed at Montgomery. Such modification was made in compliance with the provisions of the published tariff applicable thereto, and also in accordance with section 5067 of the Revised Codes of Montana; also in accordance with the well-established custom of railroads and in commercial circles to recognize the person producing and holding the bill of lading as the one entitled to control and direct the handling of the freight. (*Ryan* v. *Great Northern Ry. Co.,* 90 Minn. 12, 95 N. W. 758; see, also, secs. 29 and 32 of the Act of Congress of August 29, 1916, relating to bills of lading; secs. 8604 (o) and 8604 (pp), U. S. Comp. Stats. 1916.)

Manifestly, the bill clerks of the railway company, upon receiving in the regular way these orders eliminating the notation to stop at Montgomery, were warranted in making out the livestock contract or bill of lading over the Burlington without any such notation, and the conductor on the Burlington train was justified in relying upon such bill of lading and waybill, without any notation to stop at Montgomery, and was not negligent in carrying the shipment on through to Chicago. If the plaintiffs, by the want of ordinary care, allowed the man in charge to believe he possessed such authority, or if by the want of ordinary care they caused or allowed the billing clerks at South St. Paul to believe he possessed such authority, they are bound by his acts; and, of course, could not recover any damages that may have been sustained by reason thereof. (See secs. 5430–5432, Rev. Codes; 2 C. J., "Agency," secs. 211, 212; *Adams Express Co.* v. *Carnahan,* 29 Ind. App. 606, 94 Am. St. Rep. 279, 63 N. E. 245, 64 N. E. 647.)

In the absence of statute, or of special instructions to the carriers, limiting the authority of the man in charge of this shipment, he was clearly acting within the scope of his authority. (*Squire* v. *New York Cent. R. R. Co.*, 98 Mass. 239, 93 Am. Dec. 162; *Hill* v. *Boston etc. R. Co.*, 144 Mass. 284, 10 N. E. 836; *Armstrong* v. *Chicago, M. & St. P. Ry. Co.*, 53 Minn. 183, 54 N. W. 1059; *Willard* v. *Chicago & N. W. Ry. Co.*, 150 Wis. 234, 136 N. W. 646; *Donovan* v. *Wells Fargo & Co.*, 265 Mo. 291, 177 S. W. 839; *Atchison, T. & S. F. Ry. Co.* v. *Baldwin*, 53 Colo. 416, 128 Pac. 449; *Great Northern Ry. Co.* v. *O'Connor*, 232 U. S. 508, 58 L. Ed. 703, 34 Sup. Ct. Rep. 380 [see, also, Rose's U. S. Notes]; *Zimmer* v. *New York Cent. & H. R. R. Co.*, 137 N. Y. 460, 33 N. E. 642.)

MR. CHIEF JUSTICE BRANTLY delivered the opinion of the court.

This is an action by plaintiffs to recover from the defendant $6,835.54 upon two causes of action for damage to shipments of lambs from points on its railway in Montana, to Chicago, Illinois.

The first cause of action alleges $1,240.30 damage to six cars of lambs shipped from Bozeman, in Gallatin county, on September 15, 1916. The second alleges $5,595.24 damages to three cars of lambs shipped from Deer Lodge, six cars from Gold Creek, both in Powell county, and nine cars from Philipsburg, in Granite county, on October 16, 1916. Except as to the dates and number of cars, the averments in the two causes of action are substantially identical.

It is alleged that under the rules and regulations of the Chicago, Burlington & Quincy Railroad Company, defendant's connecting line between St. Paul and Chicago, referred to hereafter as the Burlington Railroad Company, plaintiffs had the right to order the lambs stopped in transit to feed and fatten at Montgomery, Illinois, for a period not exceeding six months; that in the exercise of this right, the plaintiffs ordered the defendant and its connecting carrier to stop the lambs to feed

at that place before being sent into Chicago for market; that when such animals are shipped from Montana points to the Chicago market, it is customary to stop them at some station near Chicago for feeding in order to allow them to regain flesh lost by shrinkage during their transit and to finish them for the Chicago market; that for this purpose they are commonly fed at Montgomery, Illinois, all of which was and is known to the defendant and the owner of its connecting line from St. Paul to Chicago; that it was the duty of the Burlington Railroad Company to stop the lambs at Montgomery; that in violation of plaintiffs' order, the lambs were not stopped at Montgomery, but were carried by that station directly to the stockyards in Chicago, reaching there and being forced upon the market in a shrunken condition, to plaintiffs' loss and damage in the amounts claimed.

The answer admits that the lambs were consigned for shipment by the defendant and its connecting line to Chicago. It alleges that they were accepted by defendant for carriage to their destination subject to the rates and tariffs filed by the defendant with, and approved by, the Interstate Commerce Commission, and upon the terms and conditions stated in a special contract in writing entered into by the plaintiffs and defendant upon a sufficient consideration—a special reduced rate of carriage as provided for in said tariffs—duly signed by the plaintiffs or their agent, and by the agent of the defendant, and accepted by the plaintiffs at the time the lambs were delivered to the defendant. All the other allegations of the complaint are put in issue. Upon a trial to a jury, plaintiffs had a verdict and judgment for $3,892.32, together with their costs and disbursements. Plaintiffs and defendant each moved for a new trial. The motions were denied. Both have appealed from the judgment and the orders denying their respective motions for a new trial.

At the trial it appeared that all the shipments were accepted by the defendant under special contracts reading from the several stations mentioned, to Rosenbaum Bros. & Co., at Chi-

cago; those from Philipsburg, Gold Creek and Deer Lodge being carried on one train, and the one from Bozeman on another. None of the contracts called for stops in transit, except that the one covering the six cars from Bozeman had on the face of it a notation requiring stops at Mandan, North Dakota, and South St. Paul, Minnesota, and the one from Philipsburg calling for a stop for feeding at Montgomery, Illinois. Each contract contained these stipulations: "The shipper will load, unload, care for, feed and water the stock while in the possession of the company and will furnish to go with the stock for that purpose, one or more attendants, according to the rules of the company, and if the shipper fails, for any reason, to furnish such attendant, whatever shall be done by the company with respect to the care of the stock in transit will be considered as done by it at the request and as representative of the shipper. * * * All the provisions of this contract are to be controlling between the parties hereto as to said shipment without regard to whether the transportation of such shipment has already been commenced or undertaken by said company." The waybills all contained directions for stops at Mandan and South St. Paul, but at no other intermediate point, except that the waybills for the cars shipped from Philipsburg contained a direction to stop for feed at Montgomery.

The published tariffs filed with and approved by the Interstate Commerce Commission contain these provisions regarding the privilege of stops for feeding, *etc.:* "Attention is called to the fact that agents should note on livestock contracts points at which shippers desire stops for feeding and water. * * * When shippers give instruction for stops for feed * * * notation must be made across the face of the contract. Also on waybills, designating at what points stops are desired. Shippers should be given to understand that where contracts bear no notation to stop,. no stop will be made except as required by the regulations of the Bureau of Animal Industry, United States Department of Agriculture, or other state or

federal laws.    In naming stopping points, shippers must be
limited to intermediate points designated by this company
for that purpose and in accordance with current routing in-
structions.    *   *   *   Shippers of livestock should be given to
understand that destination or points at which animals are to
be stopped for feed, as originally shown on the waybill, can-
not be changed except upon written instructions of the owner
or his authorized agent, the question of ownership or agency
to be determined by proper identification.    In event of such
written request being made, it shall be attached to the waybill,
also indorsement made on contract and signed by the party
giving the order.''

It appears from the evidence that when the lambs from
Deer Lodge, Gold Creek, and Philipsburg arrived at St. Paul,
one William M. Dauer, the person then apparently in charge
of and accompanying the lambs, who had the original contract
of the defendant in his possession, gave shipping orders to
Ronkin, billing clerk of the St. Paul Union Stockyards Com-
pany, for the movement of the lambs from St. Paul to Chicago
over the Burlington Railroad.    These shipping orders, signed
by Dauer, were then turned over to the billing clerk of the
joint railway offices at South St. Paul for his information and
guidance in making out the contracts covering the shipments
from that point to Chicago over the Burlington Railroad.
The contracts from that point to Chicago were made out by
him.    The orders signed by Dauer eliminated the notation on
the contract of the stop for the Philipsburg lambs at Mont-
gomery.    It was also canceled on the waybills by a line drawn
through it in ink, presumably by the billing clerk.    The con-
tracts over the Burlington Railroad were thereupon drawn in
accordance with these orders and contained no notation for
stop at Montgomery.

The plaintiffs were permitted, over objection of defendant,
to introduce evidence of oral directions by plaintiff Cook, or
his agents who assisted to load the lambs at the several
shipping points, to the local agents of the defendant before

the several contracts were signed and the waybills made out. The purpose of this was to show that orders were given to the defendant by plaintiff and his agents to note upon the contracts and waybills that the lambs were to be stopped at Montgomery for feeding. Evidence was also admitted over objection tending to show that it is the custom of persons shipping lambs over the defendant's railroad from Montana points to Chicago over the Burlington Railroad, to have them stopped at Montgomery for rest and feeding before they are put upon the market at Chicago. The evidence on these points was in conflict. The several agents of the defendant testified in effect that they made out the several contracts and waybills as they were directed, making such notations on the contracts as the plaintiffs or their agents desired. Other witnesses testified that it was frequently the case that lambs were transshipped from South St. Paul to Chicago over the Burlington Railroad without stopping at any intermediate point.

Evidence was introduced by defendant tending to show that frequently orders are given by shippers at South St. Paul, changing the billing at these points so that lambs are carried from that place through to Chicago without stop. There was also evidence to the effect that when a shipper puts a man in charge of stock, the latter is supposed to be the representative of the owner from that time; that the contract which the man in charge has shows that he is accompanying the stock, and that his name is written on the back of it as the man in charge; that he is entitled to free transportation home upon surrendering the contract at the end of the route; that one Fraser was selected to accompany the Philipsburg, Gold Creek, and Deer Lodge shipments; that his name was indorsed on the contracts, and that he accompanied them to Billings, Montana, but became ill there, and that some other person was substituted in his place; and that the name of such person was not indorsed on the contract. It is not clear from the evidence who employed him.

The witness Rea had sold the lambs to the plaintiffs, and gave directions about their loading and billing. He stated: "I did say that when I got here [Billings] with the Gold Creek, Deer Lodge, and Philipsburg sheep, that Fraser got sick, and we picked up some one here in the yard. * * * I do not know where he is now. We gave him a letter to Mr. Erickson to get his transportation back. His name wasn't on the contract, but we gave him a note to Mr. Erickson to try to get a pass back because Fraser was sick. The fellow's name was Smith, as I recall. * * * When we put a man in charge of the sheep, he is supposed to be the representative of the owner from that time on. Of course, when we pick up a tramp along to go just to carry the count for the stockyard man, to count the sheep back in the car, I don't know whether you would call him an agent or not. We don't label him with a tag that he is a tramp and has no responsibility so that the agent would see and identify him along the road, but I suppose when we bill sheep that the billing is what counts. In other words, that they are going to be handled according to the billing and contract." The Erickson referred to was shown to have been the superintendent of the feeding yards of the Burlington Railroad Company at Montgomery.

At the close of all the evidence, the defendant moved the court to strike out that relating to oral instructions and directions regarding the shipping of the lambs made at the time of the execution of the contracts, and to withdraw from the consideration of the jury all evidence of damage arising out of the failure of the Burlington Railroad Company to stop the lambs at Montgomery in so far as it was claimed for failure to stop those shipped from Gold Creek, Deer Lodge, and Bozeman, on the ground that the evidence in this connection was wholly incompetent. Defendant also moved the court to withdraw from the consideration of the jury the question of damage to the shipment from Philipsburg, on the ground that the original contract for the shipment of these lambs was modified and changed by a written order signed by the man in

charge of them who was in possession of the original contract
or bill of lading at St. Paul, eliminating the notation directing
the stopping of the lambs at Montgomery and also the notation
on the waybills, thus modifying the contract and authorizing
the Burlington Railroad Company to carry these lambs through
to Chicago without stopping at Montgomery for rest and feed-
ing.   The defendant also moved the court to direct a verdict
in its favor as to each of the shipments, on the ground that
there was no competent evidence to sustain the allegations of
the complaint in that it appeared that each of the shipments
at the time the lambs were received by the Burlington Rail-
road was moving under contracts and waybills providing for
a through transit to Chicago without stop at Montgomery, and
also on the ground that there was no substantial evidence to
show that the Burlington Railroad Company violated the pro-
visions of these contracts, or either of them.   The motions
of defendant were sustained as to all the shipments except the
one from Philipsburg.   As to this, the motion was denied.

The plaintiffs then moved the court to strike out all evidence
introduced by the defendant showing a change of the billing
of the Philipsburg shipment from South St. Paul to Chicago,
on the ground that it was incompetent.   This motion was sus-
tained.   The cause was then submitted to the jury under an
instruction to find the issues in favor of the plaintiffs as to
this shipment, and directing the jury to determine the amount
of damages, if any, that the plaintiffs sustained, not exceeding
the sum of $3,263.82, with interest from October 23, 1916.
The jury found a verdict in favor of the plaintiffs in this
amount.

We shall first dispose of plaintiffs' appeals.   They assail the
[1]   integrity of the judgment so far as they were denied
recovery for alleged damage to the Deer Lodge, Gold Creek,
and Bozeman shipments, by the order of the court sustaining
defendant's motion to strike out all the evidence to which it
related.   In this ruling, the court evidently proceeded upon
the theory that the evidence was incompetent because the effect

of it would have been to vary the terms of the contracts, by adding to each of them a stipulation for a stop at Montgomery. We think the ruling was correct. The published tariffs and regulations made a part of them enter into and form a part of the contract of shipment. The shipper and carrier are both bound to take notice of them, and, whether the shipper has actual knowledge of them or not, they are conclusive upon him, as well as the carrier, so long as they remain operative. (*Chicago, R. I. & P. Ry. Co.* v. *Cramer,* 232 U. S. 490, 58 L. Ed. 697, 34 Sup. Ct. Rep. 383; *Great Northern Ry. Co.* v. *O'Connor,* 232 U. S. 508, 58 L. Ed. 703, 34 Sup. Ct. Rep. 380; *Atchison, T. & S. F. R. R. Co.* v. *Robinson,* 233 U. S. 173, 58 L. Ed. 901, 34 Sup. Ct. Rep. 556; *Boston & M. R. R. Co.* v. *Hooker,* 233 U. S. 97, L. R. A. 1915B, 450, Ann. Cas. 1915D, 593, 58 L. Ed. 868, 34 Sup. Ct. Rep. 526.) They make it the duty of the local agents of the defendant railway company to write the notations for stops desired upon the face of the contracts. Such notations become binding upon a carrier and its connecting lines when made, just as though they were incorporated in the contract as formal stipulations; and, being noted upon the waybills, become the binding directions to the conductor in charge, except so far as the railroad company is required by some state or federal law, or for some unforeseen accident, to stop at other points than those designated by the shipper. If the railroad or its connecting line then assumes to stop at any other point, it does so at its peril. It is only upon the theory that this is so that plaintiffs can justify the contention now made that defendant became liable for the failure of the Burlington Railroad Company to stop the lambs at Montgomery. Likewise the shipper is bound by the contract as executed by the carrier and as accepted by him. It states the terms and conditions upon which the shipment is accepted, and, being clear and explicit in its terms, these must control both parties for all the purposes and incidents of the shipment.

The negotiations between the parties and the directions, given [2] by the shipper preceding the execution of the contract and acceptance of it by him, are presumed to have been merged in the contract itself when it has assumed its final form, and evidence of terms other than those contained in it become wholly incompetent, unless a mistake or imperfection in it has been put in issue by the pleadings, or its validity has become the fact in dispute, or it has become necessary to explain an intrinsic ambiguity in the contract or to establish illegality or fraud. (Rev. Codes, secs. 7873, 5018; *Kelly* v. *Ellis,* 39 Mont. 597, 104 Pac. 873; *Ford* v. *Drake,* 46 Mont. 314, 127 Pac. 1019.) The rule is so familiar that further comment or citation of authority is unnecessary. Having accepted it, the shipper is presumed to have done so with the knowledge of its contents, and cannot thereafter assert ignorance of them as a reason why he should be allowed to resort to parol evidence of prior negotiations or agreement to vary or alter them. This is true of transportation contracts issued to passengers as well as of shipping contracts. (Rev. Codes, sec. 5340; Michie on Carriers, secs. 448, 449, 469; 10 C. J. 198; *Sanden* v. *Northern Pac. Ry. Co.,* 43 Mont. 209, 34 L. R. A. (n. s.) 711, 115 Pac. 408; *Brian* v. *Oregon, S. L. R. R. Co.,* 40 Mont. 109, 20 Ann. Cas. 311, 25 L. R. A. (n. s.) 459, 105 Pac. 489.) It may be [3] added that, while evidence of usage (custom), together with the circumstances under which a contract was made, may be admitted in proper cases to aid the court in ascertaining the true meaning of it and the intention of the parties in making it (Rev. Codes, secs. 7887, 7877), such evidence is never competent when the contract is clear and explicit in its terms and the necessity for interpretation does not arise. Under these circumstances the intention of the parties is to be ascertained from the writing itself without resort to evidence. (Rev. Codes, sec. 5028; *Riddell* v. *Peck-Williamson H. & V. Co.,* 27 Mont. 44, 69 Pac. 241; *Bullard* v. *Smith,* 28 Mont. 387, 72 Pac. 761; *Frank* v. *Butte etc. Co.,* 48 Mont. 83, 135 Pac. 904; *Brockway* v. *Blair,* 53 Mont. 531, 165 Pac. 455.) There is no

controversy but that the contracts in question here are clear and explicit in their terms. This being so, resort could not be had to parol evidence to add to them any stipulation or term which they did not contain at the time they were accepted.

Counsel cite and rely with confidence on the case of *Parham v. Chicago, M. & St. P. Ry. Co.*, 57 Mont. 492, 189 Pac. 227, in support of their contention that the evidence stricken out was competent, under the allegations of the complaint, to show that it was the custom among shippers, known to the defendant, to stop lambs for feed and rest at some point near Chicago before sending them in to put them upon the market. A cursory examination of that case, however, will disclose that it has no application to the facts of this case. In that case evidence of custom was held competent because the contract under consideration was ambiguous and it was thus made necessary to construe it by reference to the circumstances in order to arrive at the true intention of the parties.

In support of its appeals, the defendant makes several assign- [4] ments of error, but all of them in different ways present the same question, *i. e.:* Did the court commit error in striking out the evidence relating to the change in the billing of the Philipsburg shipment made by the agent of the Burlington Railroad Company at South St. Paul in compliance with the written instructions of Dauer? It is contended that there was no conflict in the evidence in this connection, and that, since it appears that Dauer, unquestionably the person in charge of the shipment, having possession of the contract, presented himself to the agent and gave him instructions in writing as required by the published tariffs, and that, since it is further shown by the evidence that it is a well-established custom among railroad carriers and in commercial circles to recognize the person producing the shipping contract as the one in control and direction in the handling of the freight, Dauer's directions were properly complied with by the agent, with the result that the original contract was modified, and that the plaintiffs were bound by it as so modified. It is true there is no conflict in the evidence as to what occurred between

Dauer and the agent. Neither is there any conflict tending to show that plaintiffs had not given to Dauer any authority other than such as was implied by the fact that he was in charge of the shipment as an attendant. How he came to be acting in this capacity is disclosed by the testimony of the witness Rea, in so far as there is any evidence on the subject at all. If it be assumed that he was the man substituted for Fraser at Billings, the attendant originally put in charge, in the absence of any specific statement by any witness in this connection, we must assume this to be the fact—he had no other or greater authority than had Fraser. Now, we apprehend that if Fraser had continued in charge it could not be insisted that he had any actual or ostensible authority to direct the agent to change the original contract in any particular. By its clear and express terms he would have possessed only the authority of an attendant, and his identification of himself by presentation of it to the agent would not have created any presumption that he had any other authority upon which the agent could legally have acted. Under the rules of the defendant railway company it was the duty of the local agent at the point of shipment to enter the name of the attendant on the back of the contract, and to require him to affix his signature for the purpose of identification as the one entitled to free transportation going and returning. In order to get free transportation, he was required to surrender the contract at the point to which the shipment was consigned. If, under the circumstances, he had been in charge at South St. Paul, the agent would have been presumed to know the extent of his authority. In any event, the agent would have been required to have him identify himself by his signature, the only means available, and by this method of identification the agent, having the contract before him, would have known exactly the extent of Fraser's authority. He would have been permitted, under the circumstances, to infer nothing else than that Fraser was simply an attendant with such authority as was defined in the contract. He would not have been justified, therefore, in modifying the contract at Fraser's direction. Now, as we have

stated, there is no evidence showing that Dauer had been given any authority other than that which Fraser had under the contract. The burden was upon the defendant to show that he had ostensible authority to do what he did. There was no method recognized by the contract or the dealings between the plaintiffs and defendant by which he could identify himself. His own statement that he was the person in charge was the only evidence submitted to the agent. In our opinion, this was not such an identification as is required by the published tariffs. They provide that: "The points at which animals are to be stopped * * * cannot be changed except upon written instruction of the owner or his authorized agent, the question of ownership or agency to be determined by proper identification."

In our opinion, the mere possession of the bill of lading under the circumstances was not a sufficient identification, and if the agent assumed to act upon the directions of Dauer, he acted at his own risk. From this point of view the ruling of the court was correct.

We have not been favored by a brief by the plaintiffs in this connection, nor have we been cited by the defendant to any authority directly in point. On principle, we think the foregoing conclusion the only one which is legitimate upon the evidence before us. Counsel have referred us to the case of *Parham* v. *Chicago, M. & St. P. Ry. Co., supra,* but we do not think it in point because the evidence introduced by the defendant in this case was not sufficient to require the question of the ostensible authority of Dauer to be submitted to the jury.

We find no error in the record. The judgment in favor of plaintiffs is affirmed, as also are the orders denying plaintiffs' and defendant's respective motions for a new trial.

*Affirmed.*

ASSOCIATE JUSTICES COOPER, HOLLOWAY and GALEN concur.

MR. JUSTICE REYNOLDS, being disqualified, takes no part in the foregoing decision.